# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CENTRAL FLORIDA STERILIZATION, LLC,

     Plaintiff,

v.                         CASE NO.:  6:15-cv-2120-Orl-31TBS

SYNERGY HEALTH AST, LLC,

     Defendant.

_____/

## DEFENDANT, SYNERGY HEALTH AST, LLC'S, MOTION TO DISMISS COUNTS II AND III OF THE COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND MEMORANDUM OF LAW IN SUPPORT

Defendant, Synergy Health AST, LLC ("Synergy"), by and through its undersigned counsel and pursuant to Rule 12(b)(6), Fed. R. Civ. P., hereby moves to dismiss Counts II and III of the Complaint filed against it by Central Florida Sterilization, LLC ("CFS"), (Doc. No. 2, filed on December 18, 2015),[1] for failure to state a claim upon which relief can be granted, and in support thereof states as follows:

## I.  INTRODUCTION

At its heart, this action concerns the alleged breach of an Asset Purchase Agreement (the "Agreement") entered into in June of 2011 by Synergy, CFS, and non-party Wes Mathis ("Mathis"), the manager and majority shareholder of CFS.  (*See* Doc. No. 2, ¶¶ 3, 14).  Although the Agreement was the product of arms-length negotiations between sophisticated parties and clearly defines the parties' rights and obligations in connection with the transactions contemplated therein, CFS attempts to shoehorn additional claims into its Complaint against

---

[1] This case was originally filed in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida on November 6, 2015, and removed to this Court on December 18, 2015.

Synergy based on vague, unsubstantiated, and inconsistent extra-contractual "assurances," "understandings," and "representations." (*Id*. at ¶¶ 17, 21, 65, 66). Based on these vague purported statements, CFS seeks recovery for breach of the implied covenant of good faith and fair dealing (Count II) and fraudulent misrepresentation (Count III). (*See generally id*.).

Counts II and III of the Complaint, however, are belied by the plain language of the Agreement and applicable Delaware law.[2] Through Count II, CFS impermissibly seeks to use the implied covenant of good faith and fair dealing to rewrite the parties' Agreement and unilaterally impose additional obligations on Synergy which are belied by the parties' Agreement. Additionally, CFS's fraud claim contained in Count III fails for several reasons. First, CFS fails to allege or provide the requisite supporting allegations for multiple elements of the fraud claim it wishes to assert against Synergy. CFS's fraud claim is based entirely on alleged representations and assurances not contained in the Agreement. By its own binding contractual representation in the Agreement though, CFS disclaimed the existence of any "representations, warranties, inducements, promises or agreements, oral or otherwise." (Doc. No. 2-1, p. 20). Thus, CFS's alleged reliance on these alleged extra-contractual representations was not reasonable or justifiable as a matter of law. CFS also fails to allege a false representation of a material fact – as opposed to a false representation of a future intention – as required to state a claim for fraud. Finally, CFS fails to state the circumstances constituting the alleged fraud with particularity as required by Rule 9(b). For these reasons, Synergy now moves to dismiss Counts II and III of the Complaint with prejudice.

---

[2] The Agreement provides that "[t]he laws of the state of Delaware (without giving effect to its conflicts of laws principles) govern all maters arising out of or relating to this Agreement all of the transactions it contemplates, including without limitation, its validity, interpretation, construction, performance, and enforcement." (Doc. No. 2-1, p. 22).

## II.  FACTUAL BACKGROUND

Based on the allegations of the Complaint, CFS is a corporation that specializes in the sterilization of medical equipment.  (Doc. No. 2, ¶ 2).  Synergy is in the business of providing contract sterilization services.  (*Id*. at ¶ 4).  Under the Agreement, Synergy agreed to purchase from CFS certain equipment, intellectual property, and contractual rights related to CFS's ethylene oxide sterilization facility in Oldsmar, Florida (the "Facility") for approximately $3 million (the "Purchase Price").  (*See generally* Doc. No. 2-1).[3]

CFS originally purchased the Facility in January of 2011.  (Doc. No. 2, ¶ 8).   During CFS's ownership of the Facility, CFS entered into an agreement with Medrad, Inc. ("Medrad") for the purchase of additional sterilization chambers (the "Additional Chambers") to increase the Facility's sterilization capacity.  (*Id*. at ¶ 10).   In April of 2011, CFS and Synergy began discussing the potential sale of the Facility along with certain assets related to its operation.  (*Id*. at ¶ 11).   CFS assisted Synergy with its due diligence investigation regarding the potential purchase.  (*Id*. at ¶ 11).  Two months later, in June of 2011, CFS, Synergy, and Mathis entered into the Agreement, closing on the necessary transactions on or about June 15, 2011.  (*Id*. at ¶¶ 14, 16).  Under the Agreement, Synergy agreed to pay CFS $3,312,817 for certain assets related to the Facility, including equipment, intellectual property, and contractual rights.  (Doc. No. 2-1, pp. 2-3, 6).  Specifically, the contractual rights that Synergy purchased were:

> (i) all of [CFS's] rights, title and interest under that certain Purchase and Sale Agreement for the purchase of the Property by and between [CFS] and Medline Industries, Inc. ("Medline") dated as of January 15, 2011, as amended and modified as of the Closing (the "Medline Agreement"); and (ii) any and all rights, title and interest [CFS] may have as of the Closing to purchase equipment from Medrad, Inc.

---

[3] The sterilization process carried out at the Facility is used by health care companies to sterilize medical equipment and is accomplished by emitting ethylene oxide gas into vacuum-tight chambers.  (*Id*. at ¶ 9).

(*Id*. at p. 3) (emphasis in original).   Importantly, there is **no provision** in the Agreement requiring Synergy to exercise these contractual rights to purchase equipment from Medrad.   Nor is there any provision in the Agreement requiring Synergy to install any equipment purchased from Medrad at the Facility, including the Additional Chambers, or to do so within any period of time.   The Agreement does, however, contain an integration clause which provides as follows:

> (c)     Entire Agreement.   This Agreement and any attachments, schedules and/or exhibits hereto and the other Transaction Documents constitute the entire agreement between the Parties hereto with respect to the subject matter hereof. This Agreement supersedes and replaces all prior understandings, negotiations, commitments, writings and agreements between the Parties hereto, whether written or oral, express or implied, with respect to its subject matter. **Each Party to this Agreement acknowledges that no representations, warranties, inducements, promises or agreements, oral or otherwise, have been made by any Party, or anyone acting on behalf of any Party, which are not embodied herein.**

(*Id*. at p. 20) (Emphasis added).

In addition to the Purchase Price, Synergy also agreed to make up to two (2) additional payments to CFS (the "Earn-outs") if certain financial performance benchmarks related to (1) Synergy's annual revenues from service contracts for sterilization services to be performed at the Facility and (2) Synergy's return on investment ("ROI") from its operation of the Facility were achieved within specified time periods.   (*Id*. at pp. 7-8).   Under Section 2(c)(iii)(A) of the Agreement, Synergy agreed to pay CFS $335,000 "[i]f, no later than the 12 month anniversary of the Closing date," Synergy received service contracts for sterilization services to be performed at the Facility "with forecasted annual revenues from such contracts to [Synergy] in an aggregate amount of at least $1,850,000, as reasonably determined by [Synergy]."   (*Id*. at p. 7).   Under Section 2(c)(iii)(B) of the Agreement, Synergy also agreed to pay CFS an amount determined by a formula based on Synergy's ROI from its operation of the Facility "during the 15 month period commencing on the Closing Date and ending on the date of the 15 month anniversary of the

Closing Date." (*Id*. at pp. 7-8). However, the maximum amount payable under Section 2(c)(iii)(B) is $650,000. (*Id*. at p. 8).

The crux of CFS's claims for breach of the implied covenant of good faith and fair dealing and fraudulent misrepresentation is CFS's allegation that Synergy "assured" CFS and Mathis that Synergy would exercise the contractual right it was acquiring under the Agreement to purchase the Additional Chambers from Medrad and that it would install these Additional Chambers at the Facility "immediately after the Closing Date" of the Agreement. (Doc. No. 2, ¶ 17). CFS does not allege which Synergy representative allegedly made these assurances, precisely when these assurances were made, or why they were not included in the Agreement. CFS alleges, however, that the parties to the Agreement "knew and understood" that the installation of the Additional Chambers from Medrad was necessary for Synergy to obtain additional contracts for sterilization services and achieve a positive ROI. (*Id*. at ¶¶ 21, 36). In other words, CFS alleges that there was an understanding that the installation of the Additional Chambers was necessary for CFS to be entitled to payment of each of the Earn-outs from Synergy. (*See id*.).

CFS alleges that the reason the Earn-out tied to Synergy's ROI was based on a fifteen (15) month period instead of the twelve (12) month period used for the Earn-out tied to Synergy's annual revenue is that there was an "understanding between the (sic) Mathis and Synergy that the installation of the additional sterilization chambers was to occur within the 3 months immediately following the execution of the Contract, and that the installation of the additional sterilization chambers would be necessary to achieve a positive ROI . . ." (*Id*. at ¶ 35). Contrary to the alleged assurances and understandings regarding the Additional Chambers, CFS alleges that "Synergy delayed the installation of the additional chambers until after the times

contemplated in both Section 2(c)(iii)(A) and Section 2(c)(iii)(B) of the Contract."  (*Id*. at ¶¶ 24, 38).

Additionally, CFS alleges that after the execution of the Agreement, Mathis made inquiries to Synergy representatives as to when the Additional Chambers would be installed, and in response was informed that "the timeframe for the installation of the additional sterilization chambers was delayed."  (*Id*. at ¶ 23).  CFS asserts that Synergy "repeatedly stated to CFS and Mathis that its delay in installing the additional sterilization chambers was hindering its efforts to sign service contracts with potential customers" and "was hindering its efforts to produce a positive ROI."  (*Id*. at ¶¶ 22, 37).

Curiously, despite CFS's repeated allegations that the Additional Chambers were necessary for CFS's entitlement to the Earn-outs and that Synergy delayed installing the Additional Chambers until the timeframes for determining the Earn-outs had passed, CFS also alleges that the revenue and ROI benchmarks for payment of the Earn-outs were nevertheless timely achieved.  (*Id*. at ¶¶ 26, 30, 31, 41).  CFS thus alleges that Synergy was obligated to pay the Earn-outs to CFS, and that its refusal to do so is a breach of the Agreement.  (*See* Doc. No. 2, ¶¶ 45-51).  Accepting these allegations as true at this stage, Synergy's instant Motion to Dismiss is not directed at Count I of the Complaint for Breach of Contract.  However, for the reasons set forth below, Counts II and III of the Complaint each fail to state a claim upon which relief can be granted.

### III.  STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion to dismiss, a court must accept the allegations in the complaint as true and construe them in a light most favorable to the plaintiff.  Fed. R. Civ. P. 12(b)(6).  To satisfy the pleading requirements of Fed. R. Civ. P. 8, a complaint must give the

defendant fair notice of what the plaintiff's claims are and the grounds upon which they rest. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (citation omitted).

A plaintiff is required to allege the grounds of its entitlement to relief with "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *See Lewis v. Seneff*, 654 F. Supp. 2d 1349, 1354 (M.D. Fla. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff "must plead enough facts to state a plausible, and not merely conceivable, basis for the claim." *See id.* at 1355 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.*

To determine whether the Complaint states a claim, the scope of the Court's review is limited to the four corners of the complaint, which includes any attached exhibits. *Cruz v. Underwriters at Lloyd's London*, No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at *2 (M.D. Fla. Aug. 1, 2014); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). In the event a complaint's allegations contradict an attached exhibit, the exhibit controls. *Id.* "Dismissal is also warranted under Rule 12(b)(6) if, assuming the truth of the factual allegations of a plaintiff's complaint, there remains a dispositive legal issue which precludes relief." *Lewis*, 654 F. Supp. 2d at 1355. Indeed, a district court may dismiss a complaint under Rule 12(b)(6) when the plaintiff's own allegations indicate the existence of an affirmative defense. *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993).

## IV. ARGUMENT

**A.     CFS Fails to State a Cause of Action for Fraudulent Misrepresentation**

CFS's fraud claim (Count III) is contradicted by the Agreement and fails as a matter of law.  Under Delaware law, the elements of fraud "consist of a false representation of material fact, knowingly made with intent to be believed, to one who, ignorant of its falsity, relies thereon and is thereby deceived." *Harman v. Masoneilan International, Inc.*, 442 A.2d 487, 499 (Del. 1982).  Additionally, the plaintiff's action or inaction taken in reliance upon the false representation must be "justifiable." *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

1.     The Agreement Precludes a Finding that CFS's Reliance on Extra-
Contractual Representations was Justifiable.

CFS's fraud claim hinges entirely on its allegation that it relied upon a representation by Synergy that was not contained in the Agreement: the alleged representation that Synergy would install the Additional Chambers "at the Facility immediately after the Closing Date" of the Agreement.  (Doc. No. 2, ¶ 65).  Critically, however, CFS acknowledged through the integration clause in the Agreement "that no representations, warranties, inducements, promises or agreements, oral or otherwise," were made by any party to the Agreement which were not embodied in the Agreement.  (Doc. No. 2-1, p. 20).  This is fatal to CFS's fraud claim, as Delaware courts have held that "a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006).  *See also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n. 18 (Del. Ch. 2003) (citing *Great Lakes Chemical Corp. v. Pharmacia Corp.*,

788 A.2d 544, 555–56 (Del. Ch. 2001) ("The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.").[4]

Moreover, "[t]he existence of [an integration or merger] clause in a formal written contract between sophisticated parties is, in the absence of unconscionable or other extraordinary circumstances, conclusive evidence that the parties intended the written contract to be their complete agreement." *J.A. Moore Const. Co. v. Sussex Associates Ltd. P'ship*, 688 F. Supp. 982, 987 (D. Del. 1988) (citing FARNSWORTH ON CONTRACTS § 7.3 (1983)).  The policy behind this rule was cogently articulated in *Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382 (Del. Ch. July 9, 2002).   There, the plaintiff, Progressive, sought to rescind a license agreement and brought a fraud claim in which it argued that it had relied upon factual statements made by a defendant, DuPont, that were not incorporated into the license agreement.   *Id*. at *6.   The license agreement contained an analogous integration clause, which read as follows:

> *Integration*. This LICENSE and any attached schedules and exhibits, constitutes the entire agreement between the Parties pertaining to the subject matter contained herein and supercedes all prior and contemporaneous agreements, representations, and understandings of the Parties. Each of the Parties acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, concerning the subject matter hereof to induce the Party to execute or authorize the execution of this LICENSE, and acknowledges that the Party has not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein [. . .].

---

[4] CFS fails to even allege that its reliance was reasonable or justifiable.  However, dismissal of Count III with prejudice is appropriate because, for the reasons set forth below, leave to amend the Complaint to include these allegations would be futile.  *See, e.g., Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) (citing *Hall v. United Ins. Co. Of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004)) (holding that leave to amend a complaint is futile when the complaint, even if amended, would still be properly dismissed or immediately subject to summary judgment for the defendant).

*Id*. at \*5 (Del. Ch. 2002).

After concluding that there could be "little question" that Progressive was a sophisticated party and was thus bound by the clear terms of the license agreement it negotiated, including the integration clause, the court dismissed Progressive's fraud claim.  Articulating why permitting such claims to go forward would frustrate the public policy of Delaware and create a troubling precedent for parties to commercial contracts, the court reasoned:

> When it signed the Agreement, Progressive averred that it had read all its terms and agreed to all its provisions, including the provision stating it was not relying upon any representations outside the four corners of the contract. But Progressive now asserts that it was -- contrary to its promise to DuPont -- relying on cost-of-production representations outside the scope of that Agreement. In essence, Progressive is saying to the court, "Believe us now when we tell you we made a false promise to DuPont then."

> The law cannot sanction this type of argument. DuPont bargained for the promises made in the integration clause. Had Progressive insisted upon the elimination of that clause, DuPont might well have decided not to sign the License Agreement, precisely because it did not want to be subjected to after-the-fact rescission claims premised on oral discussions between the parties that were never formalized into contractual promises.

> If Progressive is allowed to proceed with its fraudulent inducement claims, it will be released from its own breach of the License Agreement, a result that is unreasonable and that creates a troubling precedent for commercial parties forging future contracts. By contrast, if Progressive is expected to live up to its own words, the reasonable expectations of the parties to the License Agreement are enforced and the importance of contractual text is reinforced -- results in keeping with the public policy of this state.

*Progressive*, 2002 WL 1558382 at \*10.

Similarly, in *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 551 (Del. Ch. 2001), the court dismissed a plaintiff's fraud claims, finding that contractual disclaimers precluded any claim of justifiable reliance on alleged fraudulent misrepresentations.  In doing so, the court distinguished *Norton v. Poplos*, 443 A.2d 1, 3 (Del. 1982), an earlier case which held that a contract in which the plaintiffs had specifically "acknowledge[d] that they d[id] not rely on

any written or oral representations not expressly written in [the] contract" did not bar a fraud in the inducement claim. *Id*. at 555.

The *Great Lakes* court reasoned that "quite different circumstances" were presented, where, as is the case here, sophisticated parties had carefully negotiated a complex contract after conducting months of due diligence. *Id*. at 555-56. Thus, in cases like the case at bar, Delaware law clearly permits parties to extinguish fraud claims through contractual disclaimers. The court further reasoned that were it to hold otherwise, the parties' contract would "not be worth the paper it is written on. To allow [plaintiff] to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements." *Id*. at 556.

Synergy acknowledges that in certain very limited instances, Delaware courts have permitted fraud claims premised on extra-contractual representations to go forward despite the presence of integration clauses in the contracts at issue. In *Kronenberg v. Katz*, No. C.A. 19964, 2004 WL 5366649, at *19 (Del. Ch. May 19, 2004), the court held that "[t]he presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims."[5] Subsequent case law decided after *Kronenberg* and *Great Lakes*, however, finds

---

[5] The integration clause at issue in *Kronenberg*, however, consisted of one sentence in a LLC Agreement which simply read:

> GP 18.1 *Entire Agreement*. This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements, or conditions, oral or written, express or implied.

2004 WL 5366649, at *15. This integration clause was shown to be a standard integration clause "incorporated into 'model' agreements for limited liability companies and other entities," and the commentary in the treatise which contained the model agreement with this clause did not suggest that it was intended to bar fraud claims. *Id*. at *18.

that an integration clause "need not necessarily contain the words 'rely' or 'reliance'" in order to preclude a fraud claim, as long as the integration clause "'clearly' and 'explicitly' promise[s] not to rely." *E.g.*, *In re Med. Wind Down Holdings III, Inc.*, 332 B.R. 98, 105 (Bankr. D. Del. 2005).

Here, the integration clause in the Agreement goes markedly further than the clause in *Kronenberg* and is much more analogous to the contracts which defeated fraud claims in *Progressive* and *H-M Wexford*.[6]   After providing that the Agreement and its attachments and exhibits constitute the parties' entire agreement with respect to the subject matter thereof, the integration clause states that the Agreement "supersedes and replaces all prior understandings, negotiations, commitments . . . whether written or oral, express or implied . . ." (Doc. No. 2-1, p. 20).  At this point, the integration clause has accomplished the purpose that the *Kronenberg* court suggests the integration clause at issue there was intended to accomplish: simply "to limit the scope of the parties' contractual obligations to those set forth in the written agreement."  2004 WL 5366649, at *15.  However, the Agreement's integration clause goes much further than the clause in that case, and adds a specific acknowledgment by "[e]ach Party . . . that **no representations . . . *inducements*, promises or agreements, oral or otherwise, have been made . . . which are not embodied herein**." (Doc. No. 2-1, p. 20) (emphasis added).  This language, especially considered in light of the nature of the Agreement and the sophisticated parties negotiating it, clearly demonstrates that CFS agreed that it was not relying on anything outside of the Agreement.

---

[6] The integration clause in *H-M Wexford* stated:

> This Agreement, including documents, Schedules, instruments and agreements referred to herein, and the agreements and documents executed contemporaneously herewith embody the entire agreement and understanding of the parties hereto in respect to the subject matter hereof. There are no restrictions, promises, representations, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

*H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 141 (Del. Ch. 2003).

As it relates to contracts, an inducement is "[t]he benefit or advantage *that causes a promisor to enter into a contract*."   INDUCEMENT, Black's Law Dictionary (10th ed. 2014) (emphasis added).   Thus, CFS explicitly acknowledged that nothing outside of the Agreement caused it to enter into the Agreement, and therefore that it was not relying on anything outside of the Agreement.   Now, however, CFS claims that it did in fact rely on extra-contractual purported "assurances" regarding the Additional Chambers.   Like the plaintiffs in *Progressive* and *Great Lakes*, however, CFS is a sophisticated entity and should be "expected to live up to its own words."   *Progressive*, 2002 WL 1558382 at *10.

Here, the Agreement was the product of careful negotiations between sophisticated parties after a due diligence investigation.   CFS is a corporation in a highly specialized and technical industry, and at the time the Agreement was negotiated "had a customer base that represented over $2.5 million in annual revenue."   (Doc. No. 2, ¶ 13).   CFS assisted Synergy with its pre-negotiation due diligence investigation, (*Id.* at ¶ 12), and "participated jointly in the negotiation and drafting of th[e] Agreement."   (Doc No. 2-1, p. 23).   Moreover, the Agreement contemplated a transaction worth more than $3 million dollars to CFS.   (*Id.*, pp. 6-8).

Stated differently, this was not a simple contract of adhesion with boilerplate language presented on a "take it or leave it" basis.   Rather, the Agreement was contemplated for months and was carefully drafted to cover multiple complex business transactions.   It included, for example, not only provisions the sale of intellectual property and contractual rights, but also a non-competition agreement.   (*Id.* at pp. 2-3, 13-15).   Under circumstances such as these, where an allegedly material representation is entirely omitted, without explanation, from a comprehensive contract between sophisticated business entities, Delaware law requires that the

commercial expectations of the parties be upheld and the plain language of the parties' agreement be enforced, including the integration clause.

Finally, given the sophisticated nature of the parties to the Agreement, the language and nature of the Agreement, and the amount of money involved, whether or not the integration clause is interpreted to serve as an absolute bar to CFS's fraud claim, it was nevertheless not justifiable or reasonable as a matter of law for CFS to rely on alleged extra-contractual assurances regarding the Additional Chambers. To borrow the *Progressive* court's reasoning, "[i]t would have been easy for the parties to have addressed [CFS's] concerns with contractual language." *Progressive*, 2002 WL 1558382 at *10. Having failed to do so, CFS cannot now be released from its own breach of the Agreement and permitted to proceed with its fraud claim.

2.     CFS Fails to Allege a False Representation of Fact.

Under Delaware law, "[g]enerally, prior oral promises or statements of future intent do not constitute 'false representation[s] of fact' that would satisfy the first element of fraudulent misrepresentation." *MicroStrategy Inc. v. Acacia Research Corp.*, No. C.A. 5735-VCP, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010). Rather, a "viable claim of fraud concerning a contract must allege misrepresentations of present facts (rather than merely of future intent) that were collateral to the contract and which induced the allegedly defrauded party to enter into the contract." *Id*. (quoting *Carrow v. Arnold*, No. C.A. 182-K, 2006 WL 3289582, *8 (Del. Ch. Oct. 31, 2006). Prior oral promises or statements of future intent can only form the basis of a fraudulent inducement claim where the plaintiff "plead[s] *specific facts* that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made." *Id*. (emphasis added) (quoting *Grunstein v. Silva*, No. C.A. 3932-VCN, 2009 WL 4698541, *13 (Del. Ch. Dec. 8, 2009)).

Importantly, merely showing "[a] party's failure to keep a promise does not prove that the promise was false when made." *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, No. C.A. 13579, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997). However, "relevant circumstances include a failure to perform, a failure to attempt performance, a repudiation of the promise soon after making it, and the speaker's continued assurances after it is clear the speaker does not intend to perform." *Grunstein*, 2009 WL 4698541 at *13, n. 89 (quoting 9 Stuart M. Speiser et al., The American Law of Torts § 32:27 at 266–67 (2009)).

Here, CFS does not allege that that Synergy failed to attempt to install the Additional Chambers within the period of time allegedly promised. Nor does it allege that Synergy repudiated its promise soon after making it, or that Synergy gave any assurances that it did not intend to perform. CFS's fraud claim is clearly based on Synergy's alleged promises and misrepresentations of its future intent to install the Additional Chambers, warranting dismissal as to Count III.

Additionally, there is a dearth of specific facts alleged regarding the particular promises and misrepresentations Synergy allegedly made. For instance, there are no allegations concerning the actual identity of the alleged promisor. Synergy can obviously only "speak" through its representatives, but without pleading specific facts regarding the identity of the Synergy representative or representatives who allegedly made the promises regarding the Additional Chambers, it is impossible for this Court to infer their intention of performing these promises when they were made, and impossible for Synergy to respond to the Complaint in its current form.

Next, it is unclear precisely what Synergy allegedly promised CFS regarding the Additional Chambers. As set forth above, in different paragraphs of the Complaint, CFS alleges

in a contradictory manner that Synergy represented that it would install the Additional Chambers "immediately after the Closing Date" and later that there was an understanding that the Additional Chambers would be installed "within the 3 months immediately following the execution of the Contract."  (Doc. No. 2, ¶¶ 17, 35).  Both of these allegations are incorporated into Count III of the Complaint.  (*Id.* at ¶ 63).  The inconsistency of these allegations, combined with their lack of specificity, precludes a "reasonable inference" based on "specific facts" that Synergy had no intention of performing its alleged promises when made, as is required by Delaware law when, as is the case here, a fraud claim is premised on promises of future intent. *See MicroStrategy*, 2010 WL 5550455, at *15.

CFS also fails to identify how the alleged representations regarding the Additional Chambers were made.  It is unclear from the Complaint if the representations were conveyed to Synergy orally, in written correspondences, or in prior agreements or memoranda of understanding.  Finally, it is also unclear precisely when the alleged representations were made, as CFS only generally avers that representations and assurances regarding the Additional Chambers were made "[a]t all times material."  (*Id.* at ¶¶ 17, 65).

Thus, given CFS's failure to allege either a false representations of present fact or specific facts regarding the allegedly false promises of future intent, its claim for fraud must be dismissed.

3.     CFS Fails to State the Circumstances Constituting Fraud with Particularity.

For the same reasons set forth in Section IV.A.2, *supra*, Count III should be dismissed for failure to state the circumstances constituting the alleged fraudulent misrepresentations with sufficient particularity.  "The requirements of the particularity standard are well established: 'The circumstances which shall be stated with particularity in Rule 9(b) refer to the time, place

and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc*., 854 A.2d 121, 144 (Del. Ch. 2004). *See also H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 145 (Del. Ch. 2003) ("Essentially, to satisfy [the Rule 9(b)] requirement, the plaintiff must allege circumstances sufficient to fairly apprise the defendant of the basis for the claim.").

As set forth above, CFS does not state with any degree of particularity the time or place of the allegedly false representation, or the identity of the person making the misrepresentation. CFS also fails to consistently allege the contents of the contents of the alleged false representation and the facts misrepresented. Dismissal is thus required under Rule 9(b), Fed. R. Civ. P.

**B.    CFS Impermissibly Attempts to Use the Covenant of Good Faith and Fair Dealing to Rewrite Synergy's Contractual Obligations**

Quite clearly, through its claim in Count II for breach of the implied covenant of good faith and fair dealing (the "Implied Covenant"), CFS seeks to have the Court rewrite the Agreement to include a provision requiring Synergy to have installed the Additional Chambers within what CFS unilaterally believes to be a more "reasonable period of time." (Doc. No. 2, ¶ 57). This is clearly an improper use of an Implied Covenant claim under Delaware law, and moreover, is foreclosed by CFS's allegations regarding the parties' knowledge and understanding, and Synergy's alleged representations, with respect to the installation of the Additional Chambers.

Under Delaware law, the implied covenant of good faith and fair dealing has a "limited scope and function" and "cannot properly be applied to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'" *Winshall v. Viacom Intern*.,

Inc., 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)).  *See also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (App. Div. 1994)) (holding that "implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty...unattached to the underlying legal document.'") (internal citations omitted); *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (citing *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983)) ("Delaware observes the well-established general principle that (absent grounds for reformation which are not present here) it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement.").

"Rather, a party may only invoke the protections of the covenant when it is clear from the underlying contract that 'the contracting parties would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter.'"  *Winshall*. 76 A.3d at 816 (quoting *Winshall v. Viacom Intern., Inc.*, 55 A.3d 629, 637 (Del. Ch. 2011)).  *See also Nemec v. Shrader*, 991 A. 2d 1120, 1126 (Del. 2010) ("The implied covenant only applies to developments that could not be anticipated . . .").  Additionally, "because the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."  *Fisk Ventures, LLC v. Segal*, No.C.A. 3017-CC, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) (emphasis in original).  *See also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) ("[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand.").

Here, CFS's Implied Covenant claim fails for at least two reasons.  First, the Agreement itself is not "truly silent" with respect to the subject of the Additional Chambers, and thus the implied covenant cannot be invoked to alter the parties' express obligations set forth therein. Second, CFS admits that, during negotiations of the Agreement, the parties anticipated the installation of the Additional Chambers, as there were allegedly representations and assurances made regarding the Additional Chambers "at all times material," (Doc. No. 2, ¶¶ 17, 65), but CFS nevertheless failed to secure contractual provisions memorializing these promises at the bargaining table.  Now, with the benefit of hindsight and dissatisfied with the Agreement it voluntarily entered into after long negotiations, CFS cannot use an Implied Covenant claim to secure a better deal than it negotiated.

The Agreement expressly provides that Synergy was acquiring "any and all rights, title and interest" that CFS "may have as of the Closing to purchase equipment from Medrad, Inc." (Doc. No. 2-1, p. 3).[7]  Elsewhere, the Agreement contemplates Synergy's acquisition of "additional equipment, parts and/or inventory . . . after the Closing Date" as well as related "installation and engineering expenses" in connection with the calculation of Synergy's ROI. (Doc. No. 2-1, p. 7).  Thus, the subject of the Additional Chambers and their installation was covered in the Agreement and, at minimum, the Agreement is not "truly silent" with respect to these matters.

Additionally, it is blatantly obvious from CFS's own allegations and the language of the Agreement that the parties did in fact anticipate the subject of the Additional Chambers.  CFS alleges not only that Synergy, "at all times material," made assurances and representations regarding the installation of the Additional Chambers, but also that specific contractual

---

[7] CFS alleges that these rights included the right to purchase the Additional Chambers from Medrad.  (Doc. No. 2, ¶ 15).

provisions regarding the Earn-outs were drafted to harmonize the calculation of the Earn-outs with the timing of the installation of the Additional Chambers.  (Doc. No. 2, ¶¶ 17, 35, 65). Clearly, the installation of the Additional Chambers was not a matter which the parties could not have anticipated since, by CFS's own allegations, this issue was anticipated, considered, and at least partially incorporated into the Agreement.  This is fatal to CFS's Implied Covenant claim, as the protections of the implied covenant can only be invoked when it is clear that, had the parties thought to negotiate with respect to an issue, they would have expressly agreed to assume particular obligations related to that issue in the contract.  *See Winshall*, *supra*, 76 A.3d at 816; *Nemec*, 991 A. 2d at 1126.

A recent decision of the Supreme Court of Delaware is instructive.  In *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015), the Supreme Court of Delaware was confronted with a claim for breach of the implied covenant of good faith based on conduct which did not violate the parties' written agreement.  The court reversed the trial court's finding that the implied covenant of good faith had been breached, holding that an interpreting court "should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it."  *Id*. at 897 (quoting *Allied Capital*, 910 A.2d at 1035).

The same analysis applies here.  CFS could have easily insisted that the Agreement expressly require Synergy to install the Additional Chambers within a specified time frame, especially since by CFS's own admissions the parties had considered this matter and it was the subject of repeated representations by Synergy.  (*See generally* Doc. No. 2).  Moreover, CFS also alleges in its Complaint that the timely installation of the Additional Chambers was necessary for it to be entitled to approximately $1 million dollars in Earn-out payments.  (*Id*. at ¶¶ 21, 36).

Under these circumstances, and given the language of the Agreement covering the subject of the Additional Chambers, CFS cannot now use an Implied Covenant claim to rewrite its Agreement with Synergy.  Count II must therefore also be dismissed.

## V.  CONCLUSION

Based on the foregoing, Synergy respectfully requests that this Court dismiss Counts II and III of the Complaint (Doc. No. 2) with prejudice for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  Synergy further requests that this Court grant it any and all other further relief as it deems just and proper.

Respectfully submitted, this 19th day of January, 2016.

BAKER & HOSTETLER LLP
2300 SunTrust Center
200 South Orange Avenue
P.O. Box 112
Orlando, FL  32802-0112
Telephone:  407-649-4000
Telecopier:  407-841-0168

By: *s/Parker G. Jordan*
    Denis L. Durkin
    Florida Bar No. 237132
    ddurkin@bakerlaw.com
    Michael S. Vitale
    Florida Bar No. 17136
    mvitale@bakerlaw.com
    Parker G. Jordan
    Florida Bar No. 106421
    pjordan@bakerlaw.com

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on January 19, 2016, I electronically filed the foregoing motion to dismiss with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following listed counsel:

Donald Gervase, Esq.
Primary E-Mail:  dgervase@provisionlaw.com
Secondary E-Mail:  jkiss@provisionlaw.com
Provision Law PLLC
310 S. Dillard St. Ste 410
Winter Garden, FL  32787


*s/Parker G. Jordan*
Parker G. Jordan

105432.000001 607849436.1