**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

CENTRAL FLORIDA STERILIZATION, LLC,
and WES MATHIS, a/k/a/ JACK W. MATHIS,

      Plaintiffs,

v.                     CASE NO.:  6:15-cv-2120-Orl-31TBS

SYNERGY HEALTH AST, LLC,

      Defendant.

_____/

## DEFENDANT SYNERGY HEALTH AST, LLC'S MOTION TO DISMISS AMENDED COMPLAINT WITH PREJUDICE AND INCORPORATED MEMORANDUM OF LAW

Defendant, Synergy Health AST, LLC ("Synergy"), by and through its undersigned counsel and pursuant to Rule 12(b)(6), Fed. R. Civ. P., hereby moves to dismiss the Amended Complaint filed against it by Central Florida Sterilization, LLC ("CFS") and Wes Mathis ("Mathis"), (Doc. No. 22, filed on February 25, 2016), for failure to state a claim upon which relief can be granted, and in support thereof states as follows:

### I.  INTRODUCTION

At its heart, this action concerns the alleged breach of an Asset Purchase Agreement (the "Agreement") entered into by Synergy, CFS, and Mathis, the manager and owner of CFS.  (*See* Doc. No. 22, ¶¶ 3, 43).  While the Agreement was entered into in June of 2011, and had terminated approximately a year later, Plaintiffs now seek to assert causes of action which – in addition to not being properly plead – are both past the applicable statute of limitations and are barred by the plain language of the Agreement.

1

Although, as the original Complaint made clear, the Agreement was the product of arms-length negotiations between sophisticated parties and clearly defines the parties' rights and obligations in connection with the transactions contemplated therein, Plaintiffs now attempt to back away from the months of due diligence they undertook and cast the Agreement as a contract of adhesion between a large company and an inexperienced individual, procured through alleged representations by Synergy employees.  Based on these vague purported promises, CFS (and, possibly, Mathis), seeks recovery for breach of contract (Count I) and fraudulent misrepresentation (Count II).  (*See generally id.*).

Even taking the allegations of the Amended Complaint as true, both counts are subject to dismissal with prejudice.  First, the allegations of the Amended Complaint make clear that both causes of action are barred by the statute of limitations under applicable Delaware law.  Second, Plaintiffs' fraud claim, Count II, is belied by the plain language of the Agreement, which contains a merger clause barring the exact claim Plaintiffs attempt to assert here.  In addition, Plaintiffs' fraud claim is unsupported, and based entirely on alleged representations and assurances not contained in the Agreement.  By their own binding contractual representation in the Agreement though, Plaintiffs disclaimed the existence of any "representations, warranties, inducements, promises or agreements, oral or otherwise." (Doc. No. 22, p. 54).  Thus, Plaintiffs' alleged reliance on these alleged extra-contractual representations was not reasonable or justifiable as a matter of law.  Plaintiffs also fail to allege a false representation of a material fact – as opposed to a false representation of a future intention – as required to state a claim for fraud.

Third, even if these claims could survive under Delaware law, which they cannot, Mathis must be dismissed as a party, as the Amended Complaint seeks no relief on his behalf.  Finally,

Plaintiffs still fail to plead fraud with the requisite particularity required under Rule 9(b).  For these many reasons, the Amended Complaint must be dismissed with prejudice.

## II.  FACTUAL BACKGROUND

Based on the allegations of the Amended Complaint, Mathis has "a number of years" of experience working in the medical device sterilization field, including as a "process supervisor, manager, and most recently as a sterilization consultant for various medical device companies in Georgia and Florida."  (Doc. No. 22, ¶ 11).  In 2008, Mathis formed CFS to operate his sterilization consulting business.  (*Id*. at ¶ 12).[1]  Synergy is a provider of contract sterilization services.  (*Id*. at p. 22).  Under the Agreement, Synergy agreed to purchase from CFS certain assets and contractual rights related to an ethylene oxide sterilization facility in Oldsmar, Florida (the "Facility") for approximately $3 million (the "Purchase Price").  (*Id*. at ¶ 43, p. 40).  The ethylene oxide sterilization process carried out at the Facility is used by health care companies to sterilize medical devices and equipment and is accomplished by emitting ethylene oxide gas into vacuum-tight chambers.  (*Id*. at ¶ 14, n.1).

### A.     The Relevant Provisions of the Agreement.

CFS originally acquired the contractual right to purchase the Facility from Medline Industries, Inc. ("Medline") for $3 million in early 2011.  (*Id*. at ¶¶ 15-17).[2]  Subsequently, CFS contracted with Medrad, Inc. ("Medrad") for the purchase of additional sterilization chambers (the "Additional Chambers") for the Facility, allegedly in order to (1) "make the Facility

---

[1] While Mathis was not an original party to this action, (*see generally* Doc. No. 2), he has been added to the case caption in the Amended Complaint.  However, neither of the causes of actions in the Amended Complaint seek any relief on Mathis' behalf.  (*See, e.g.*, Doc. No. 22, ¶¶67, 77, 78, 87).  Additionally, the "Wherefore" clauses of each count only state that damages are sought on behalf of CFS, not Mathis.  (*See id*. at pp. 14, 16).

[2] In the Amended Complaint, Plaintiffs alternate between alleging that Mathis acquired the rights to purchase the Facility and alleging that CFS acquired these rights.  (*See Id*. at ¶¶ 16-17).  Regardless, the Agreement makes clear that Synergy was acquiring CFS's right to purchase the Facility from Medline, not any such right belonging to Mathis individually.  (Doc. No. 22, pp. 36-37).

attractive to a wider array of customers" and (2) "to have built-in redundancy in the event the Facility's existing chamber malfunctioned or needed repair."  (Doc. No. 22, ¶¶ 21-23).  Synergy purchased these rights related to CFS's agreements with Medline and Medrad as part of the Agreement.  Specifically, the contractual rights that Synergy purchased were:

> (i) all of [CFS's] rights, title and interest under that certain Purchase and Sale Agreement for the purchase of the Property by and between [CFS] and Medline Industries, Inc. ("<u>Medline</u>") dated as of January 15, 2011, as amended and modified as of the Closing (the "<u>Medline Agreement</u>"); and (ii) any and all rights, title and interest [CFS] may have as of the Closing to purchase equipment from Medrad, Inc.

(*Id.* at p. 37) (emphasis in original).   Importantly, there is **no provision** in the Agreement requiring Synergy to exercise these contractual rights to purchase equipment from Medrad.  Nor is there any provision in the Agreement requiring Synergy to install any equipment purchased from Medrad at the Facility, including the Additional Chambers, or to do so within any period of time.  The Agreement does, however, contain an integration clause which provides as follows:

> (c)    <u>Entire Agreement</u>.  This Agreement and any attachments, schedules and/or exhibits hereto and the other Transaction Documents constitute the entire agreement between the Parties hereto with respect to the subject matter hereof. This Agreement supersedes and replaces all prior understandings, negotiations, commitments, writings and agreements between the Parties hereto, whether written or oral, express or implied, with respect to its subject matter.  **<u>Each Party to this Agreement acknowledges that no representations, warranties, inducements, promises or agreements, oral or otherwise, have been made by any Party, or anyone acting on behalf of any Party, which are not embodied herein.</u>**

(*Id.* at p. 54) (emphasis added).

Despite agreeing to this clear language, Plaintiffs allege that in entering into the Agreement, Plaintiffs did in fact rely on purported assurances and representations made by Synergy and BeamOne, LLC ("BeamOne") representatives,[3] which were not embodied in the

---

[3] BeamOne was acquired by Synergy in early 2011, and thus representatives from both BeamOne and Synergy were involved in the due diligence and negotiation of the Agreement.  (*Id.* at ¶32, p. 22).

Agreement, that the Additional Chambers would be installed at the Facility "within three months immediately after closing [of the Agreement]." (*Id*. at ¶ 82-83). Plaintiff alleges that, contrary to these representations, Synergy "purposely delayed installing the [Additional] Chambers" in order to avoid making one of the two (2) payments to CFS (the "Earn-outs") which Synergy agreed to make to CFS, in addition to the Purchase Price, if Synergy achieved certain financial performance benchmarks related to the Facility. (*Id*. at ¶ 81). Plaintiffs contend that the parties to the Agreement "knew and understood" that the immediate installation of the Additional Chambers was necessary for Synergy to be entitled to this Earn-out, which was based on Synergy's return on investment ("ROI") from its operation of the Facility. (*Id*. at 53).

The Earn-outs provided for in the Agreement were tied to whether Synergy met, within specified time periods, financial performance benchmarks related to (1) Synergy's annual revenues from service contracts for sterilization services to be performed at the Facility and (2) Synergy's ROI from its operation of the Facility. (*Id*. at pp. 41-42). Under Section 2(c)(iii)(A) of the Agreement, Synergy agreed to pay CFS $335,000 (the "Revenue Earn-out") "[i]f, no later than the 12 month anniversary of the Closing Date," Synergy received service contracts for sterilization services to be performed at the Facility "with forecasted annual revenues from such contracts to [Synergy] in an aggregate amount of at least $1,850,000, as reasonably determined by [Synergy]." (*Id*. at p. 41). Under Section 2(c)(iii)(B) of the Agreement, Synergy also agreed to pay CFS an amount determined by a formula based on Synergy's ROI from its operation of the Facility "during the 15 month period commencing on the Closing Date and ending on the date of the 15 month anniversary of the Closing Date" (the "ROI Earn-out") (*Id*. at pp. 41-42).[4]

---

[4] Although Plaintiffs have omitted the allegation contained in CFS's original Complaint that the parties closed on the Agreement on June 15, 2011, (Doc. No. 2, ¶ 16), Plaintiffs appear to still consider this date the closing date of the Agreement for purposes of calculating CFS's entitlement to the Earn-outs. Plaintiffs allege that Synergy was required to pay CFS the Revenue Earn-out if Synergy hit the forecasted annual revenues benchmark "by June 15,

The Revenue Earn-out was due to be paid "within thirty (30) days of receipt of the last executed contract that causes the . . . revenue condition to be met." (*Id*. at. p. 41). However, because the Revenue Earn-out was based on contracts received by Synergy on or before June 15, 2012, the latest date for payment of the Revenue Earn-out under the Agreement was July 15, 2012. The ROI Earn-out was due to be paid "[n]o later than sixty (60) days after the end of the Earnout Period." (*Id*. at. p. 41). The "Earnout Period" is defined in the Agreement as "the 12 month period commencing on the date of the three (3) month anniversary of the Closing Date and ending on the 15 month anniversary of the Closing Date." (*Id*. at. p. 38).

Plaintiffs' breach of contract claim is based on the allegation that the financial benchmarks for CFS's entitlement to the Earn-outs were timely achieved, but that Synergy wrongfully refused to pay the Earn-outs to CFS. (*Id*. at ¶¶ 73, 75). Plaintiffs also appear to allege that Synergy breached the Agreement by informing Mathis, in a 2015 meeting, that the revenue and ROI benchmarks for payments of the Earn-outs had not been met. (*Id*. at ¶¶ 72, 74).

**B.    The Negotiation and Due Diligence Period of the Agreement.**

Plaintiffs' fraud claim is based on the allegation that Plaintiffs relied upon representations by BeamOne and Synergy representatives, which were not contained in the Agreement, that Synergy would install the Additional Chambers "within three months immediately after [the] closing" of the Agreement. (*Id*. at ¶ 82). Plaintiffs further contend that during the due diligence and negotiation of the Agreement, Synergy was aware that Mathis was in a "difficult situation" with respect to his right to purchase the Facility and that the "bargaining position between the parties was not level, but instead tremendously one-sided." (*Id*. at ¶¶ 27, 49).

---

2012" and that Synergy was required to pay CFS the ROI Earn-out based on its ROI "produced by September 15, 2012," twelve and fifteen months from June 15, 2011, respectively (Doc. No. 22, ¶¶ 44, 46) (emphasis in original).

Plaintiffs allege that Mathis' right to purchase the Facility was only good through April 15, 2011, but that despite Mathis "invest[ing] his time and approximately $450K in both personal and borrowed funds, and hir[ing] two employees to help with the acquisition of the Facility," Mathis was denied financing for the purchase of the Facility.  (*Id*. at ¶¶ 18, 24-25).  Despite alleging earlier in the Amended Complaint that Mathis has "a number of years" of experience in the medical device sterilization field, Plaintiffs attribute Mathis' failure to obtaining financing in part to his "lack of experience."  (*Id*. at ¶ 25).

After Mathis failed to obtain financing to purchase the Facility, he sought to sell the right to purchase the Facility.  (*Id*. at ¶ 26).  Mathis was introduced to Tom Stephan ("Stephan"), then BeamOne, LLC's ("BeamOne") Vice President, who offered to purchase the right to acquire the Facility.  (*Id*. at ¶ 27, 29).  Plaintiffs allege that Mathis accepted this offer, and that Synergy then began its "due diligence in contemplation of purchasing the Facility in early April of 2011."  (*Id*. at ¶¶ 27-28).  Mathis assisted Synergy with its due diligence, "by providing Synergy with all the information he possessed regarding the Facility, giving Synergy his client list and all the client information he possessed, and helping procure customers for the Facility."  (*Id*. at ¶ 31).

In their attempt to allege specific, actionable representations allegedly made by Synergy, Plaintiffs allege that during the due diligence period for the Agreement, in April of 2011, Stephan, Glen Thibault ("Thibault"), then CEO of Synergy Health Americas, and Larry Gabele ("Gabele"), then BeamOne's CFO, assured Mathis that the Additional Chambers "were to be installed immediately following Synergy's purchase of the Facility . . . and . . . that Synergy's personnel had the expertise and experience necessary to install the additional Chambers in the Facility."  (*Id*. at ¶ 33).  Plaintiffs also allege that on April 22, 2011, Mathis emailed Stephan regarding CFS's agreement with Medrad for the purchase of the Additional Chambers and

inquired as to whether BeamOne was interested in purchasing the Additional Chambers.  (*Id*. at ¶ 29, Exhibit "A").  Stephan replied that "[o]ur deal includes that you move forward with the chambers. The facility cannot make ROC without extra chambers [. . .]."  (*Id*.).

In order to close on the sale of the Facility to Synergy, Mathis sought and obtained an extension of time from Medline which permitted him to exercise his right to purchase the Facility by June 15, 2011.  (*Id*. at ¶ 38).  Plaintiffs allege that Mathis was first provided with the Agreement on June 9, 2011, and that Mathis had "no part in drafting the Agreement, nor any input regarding the terms of the Agreement prior to receiving it."  (*Id*. at ¶ 40).  However, Mathis did request that the date for determining the ROI Earn-out be moved back three months, allegedly because of the "assurances" from Synergy representatives that the Additional Chambers would be installed within three months of the closing.  (*Id*. at ¶ 50-51).  Synergy incorporated Mathis' revision to the Agreement regarding the date for determining the ROI Earn-out, and the Agreement was finalized on or about June 15, 2011.  (*See id*. at ¶¶ 50-52).  The Agreement also includes a provision which provides that "[t]he Parties have participated jointly in the negotiation and drafting of this Agreement."  (*Id*. at p. 57).

### III.  PROCEDURAL HISTORY

This case was originally filed in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida on November 6, 2015, and removed to this Court on December 18, 2015.  (*See* Doc. No. 1, ¶ 2).  The initial Complaint was filed only on behalf of CFS and included three respected causes of action for breach of contract, breach of the duty of good faith and fair dealing, and fraud.  (*See* Doc. No. 1-1).  On January 19, 2016, Synergy moved to dismiss Count II (good faith and fair dealing) and Count III (fraud) of the original complaint.  (Doc. No. 14).  On February 10, 2016, the Court entered an Order dismissing Count II with prejudice, and Count

III with leave to amend.  (Doc. No. 20).  As the Court recognized in its Order, Synergy argued, and CFS did not dispute, that Delaware substantive law applies to this case based on the express Delaware choice of law provision of the Agreement.  (*Id*. at p. 5).[5]

After the Complaint was dismissed, the operative Amended Complaint was filed on February 25, 2016.  (Doc. No. 22).  In it, Plaintiffs made a number of extensive changes to the initial complaint, including (a) adding Wes Mathis to the case caption -- and purportedly as a party to the lawsuit, (b) adding approximately 22 paragraphs to the factual allegations of the complaint; and (c) substantially modifying both the factual and legal allegations pled in both causes of action.  As such, the breach of contract and fraud claims differ substantially and bear little resemblance to those asserted in the initial complaint.  Nevertheless, the extensive changes made by the Plaintiffs do not save the Amended Complaint from dismissal.

## IV.  STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion to dismiss, a court must accept the allegations in the complaint as true and construe them in a light most favorable to the plaintiff.  Fed. R. Civ. P. 12(b)(6).  To satisfy the pleading requirements of Fed. R. Civ. P. 8, a complaint must give the defendant fair notice of what the plaintiff's claims are and the grounds upon which they rest.  *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 512 (2002) (citation omitted).

A plaintiff is required to allege the grounds of its entitlement to relief with "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *See Lewis v. Seneff*, 654 F. Supp. 2d 1349, 1354 (M.D. Fla. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  A plaintiff "must plead enough facts to state a plausible, and not merely conceivable, basis for the claim."  *See id.* at 1355 (citing *Ashcroft v. Iqbal*, 556

---

[5] The Agreement states: "[t]he laws of the state of Delaware (without giving effect to its conflicts of laws principles) govern all matters arising out of or relating to this Agreement all of the transactions it contemplates, including without limitation, its validity, interpretation, construction, performance, and enforcement."  (Doc. No. 22, p. 56).

U.S. 662 (2009); *Twombly*, 550 U.S. at 556).   "Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.*

To determine whether the Complaint states a claim, the scope of the Court's review is limited to the four corners of the complaint, which includes any attached exhibits.   *Cruz v. Underwriters at Lloyd's London*, No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at *2 (M.D. Fla. Aug. 1, 2014); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").   In the event a complaint's allegations contradict an attached exhibit, the exhibit controls.   *Id.*   "Dismissal is also warranted under Rule 12(b)(6) if, assuming the truth of the factual allegations of a plaintiff's complaint, there remains a dispositive legal issue which precludes relief." *Lewis*, 654 F. Supp. 2d at 1355.   Indeed, a court may dismiss a complaint under Rule 12(b)(6) when the plaintiff's allegations indicate the existence of an affirmative defense. *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993).

## V. ARGUMENT

### A.   Plaintiffs' Claims Are Barred By Delaware's Statute Of Limitations.

Both of Plaintiffs' causes of actions are barred by the three (3) year statute of limitations applicable under Delaware law.   Delaware Code Title 10, Section 8106(a) provides that:

> (a) No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, **no action based on a promise**, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant **shall be brought after the expiration of 3 years from the accruing of the cause of such action**; subject, however, to the provisions of §§ 8108-8110, 8119 and 8127 of this title.

This three year statute of limitations applies to both breach of contract and fraud claims.   *See,*

*e.g.*, *Ayres v. Jacobs & Crumplar, P.A.*, No. 96C-07-258-WTQ, 1996 WL 769331, at *3 (Del. Super. 1996) (citing 10 Del. C. § 8106) ("…the statute of limitations on actions for breach of contract [is] three years."); *Vichi v. Koninklijke Philips Elecs. N.V.*, No. C.A. 2578-VCP, 2009 WL 4345724, at *15 (Del. Ch. 2009) ("Delaware law sets a three year statute of limitations for claims for . . . fraud.") (citing 10 Del. C. § 8106).

The Delaware Supreme Court has "repeatedly held that a cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). Therefore, "[w]hen a complaint asserts a cause of action that on its face accrued outside the statute of limitations . . . the plaintiff has the burden of pleading facts leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies." *Vichi*, 2009 WL 4345724 at *15 (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, No. C.A. 3088-VP, 2008 WL 5352063, at *14 (Del. Ch. 2008)). "Delaware courts recognize three doctrines that may toll the statute of limitations: (1) inherently unknowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties." *Id.* at 17.

Even under these tolling doctrines, however, the statute of limitations begins to run "upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." *Id.* (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del. 2004)). In other words, if the plaintiff meets its burden of pleading facts leading to a reasonable inference that one of the tolling doctrines applies, "actual knowledge of the wrong" is still not required, and the limitations period will begin to run "when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice." *In*

*re Dean Witter P'ship Litig.*, 24 Del. J. Corp. L. 203, *6 (Del. Ch. 1998) (emphasis in original).

      1.    <u>Plaintiffs' Breach of Contract Claim is Time-Barred.</u>

Plaintiffs' breach of contract claim based on Synergy's failure to pay the Earn-outs is barred by the statute of limitations. The Amended Complaint itself makes clear that the first alleged breach of the Agreement occurred more than three years prior to CFS filing this suit in Circuit Court on November 6, 2015. "Under Delaware law, the statute of limitations for breach of contract claims begins to run when the contract is breached." *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 80 (D. Del. 2002) (citing *Freedman v. Beneficial Corp.*, 406 F.Supp. 917, 923 (D. Del. 1975)). The Agreement clearly provided a specific time period for payment of the Revenue Earn-out: "within thirty (30) days of receipt of the last executed contract that causes the . . . revenue condition to be met." (Doc. No. 22, p. 41). The Revenue Earn-out, however, was expressly based on contracts received by Synergy on or before June 15, 2012. (*Id.*). Thus, the latest date for Synergy to pay CFS the Revenue Earn-out under the Agreement was July 15, 2012. If, as CFS alleges, it was entitled to payment of this Earn-out and Synergy refused to pay the Earn-out to CFS by July 15, 2012 – 30 days later – then the Agreement was breached on this date. Therefore, CFS's cause of action for breach of the Agreement accrued on July 15, 2012, more than three years prior to CFS filing this suit on November 6, 2015.

As Plaintiffs have asserted a cause of action that, on its face, accrued outside the statute of limitations, they must plead facts leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies. *See Vichi*, 2009 WL 4345724 at *15. Plaintiffs cannot plead such facts. First, the doctrine of inherently unknowable injuries only tolls the running of the statute of limitations when "the discovery of the existence of a cause of action is a practical impossibility. For the limitations period to be tolled under this doctrine, there must

have been no observable or objective factors to put a party on notice of an injury." *In re Dean Witter P'ship Litig.*, 24 Del. J. Corp. L. 203 at *5. Obviously, it was not "practically impossible" for Plaintiffs to discover that they had not been paid by Synergy in July 2012.

Plaintiffs also fail to plead any facts suggesting that either of the remaining tolling doctrines apply, as they have not alleged (1) that Synergy fraudulently concealed the facts necessary to put Plaintiffs on notice of Synergy's alleged breach of the Agreement or (2) the existence of a fiduciary relationship between the parties to the Agreement. *See id.* (explaining that the statute of limitations may be tolled "if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth" and that "the statute of limitations is tolled for claims of wrongful self-dealing ... where a plaintiff reasonably relies on the competence and good faith of a fiduciary."). To the contrary, Plaintiffs allege that Synergy repeatedly put Plaintiffs on notice, well before the Earn-outs were due, that "the timeframe for the installation of the additional sterilization chambers was delayed" and that this delay "was hindering its efforts to sign service contracts with potential customers" and "its efforts to produce a positive ROI." (Doc. No. 22, ¶¶ 54-56). Thus, as opposed to concealing facts from Plaintiffs which would have put them on notice of Synergy's alleged breach of the Agreement, the Amended Complaint acknowledges that Synergy affirmatively gave Plaintiffs advance notice that the delayed installation of the Additional Chambers was jeopardizing Plaintiffs' entitlement to the Earn-outs. For the foregoing reasons, Plaintiffs' breach of contract claim based on Synergy's failure to pay the Earn-outs is clearly barred by Delaware's statute of limitations.

However, Plaintiffs also allege that Synergy breached the Agreement not only by actually failing to pay the Earn-outs, but also by stating to Plaintiffs, years after the Earn-outs were due, that Plaintiffs were not entitled to the Earn-outs. (*See Id.* at ¶¶ 71, 72, 74). Specifically,

Plaintiffs allege that Marc Garofani ("Garofani"), Synergy's Finance Director, somehow breached the Agreement during a June 4, 2015 meeting with Mathis by incorrectly calculating CFS's entitlement to the Earn-outs and stating that CFS would not be paid the Earn-outs.  (*Id.*). However, Plaintiffs have pled no legal basis for asserting that the Agreement was breached in June of 2015 where the first Earn-out under the Agreement was due to be paid in July of 2012. Any claim for breach of the Agreement accrued when Synergy first failed to pay an Earn-out allegedly due, not when Synergy informed Mathis, years after the fact, of what should have been obvious by then: the Earn-out benchmarks were not met.  The breach of contract claim must be dismissed with prejudice against Plaintiffs.

> 2.     Plaintiffs' Fraud Claim is Time-Barred.

While it was unclear from CFS's initial Complaint, *inter alia*, when Synergy allegedly made false representations regarding the installation of the Additional Chambers, the Amended Complaint now includes the allegation that these alleged representations were made "prior to contracting."  (Doc. No. 22, ¶ 80).  It is now clear that Plaintiffs' fraud claim is barred by the statute of limitations, as it accrued when the parties entered into the Agreement – more than three years before Plaintiffs' filed suit.  Further, Plaintiffs have not pled facts leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies.

"In cases of fraud, the cause of action accrues when the fraud is successfully perpetrated."  *Van Lake v. Sorin CRM USA, Inc.*, No. C.A. 12C04036JRJCCLD, 2013 WL 1087583, at *6 (Del. Super. 2013) (citing *Playtex, Inc. v. Columbia Cas.,* 1993 WL 390469, at *3 (Del. Super. 1993)).  *See also Puig v. Seminole Night Club, LLC,* No. C.A. 5495-VCN, 2011 WL 3275948, at *4 (Del. Ch. 2011) (finding that a fraudulent inducement claim accrues at the time the plaintiff entered into the agreement).  In the Amended Complaint, Plaintiffs allege that

Synergy's aim was to "induce Mathis to enter into the Agreement for the sale of the Facility to Synergy." (Doc. No. 22, ¶ 79). Clearly, the alleged fraud was "successfully perpetrated" when Plaintiffs executed the Agreement in June of 2011, and it is irrelevant for purposes of analyzing the accrual of Plaintiff's fraud claim that Plaintiffs may have been ignorant of the cause of action at this time. *See, e.g.*, *Wal-Mart Stores, Inc.*, 860 A.2d at 319. Thus, unless Plaintiffs can demonstrate a basis for tolling the statute of limitations, their fraud claims are barred because they accrued more than three years prior to the filing of the initial Complaint.

For many of the same reasons discussed above, Plaintiffs have failed to plead, and cannot plead, facts leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies to their fraud claim. Plaintiffs cannot show that it was "practically impossible" for them to discover the alleged fraud or that Synergy fraudulently concealed the facts necessary to put Plaintiffs on notice of the alleged fraud. To the contrary, Plaintiffs plead facts indicating that immediately after the execution of the Agreement, Synergy put Plaintiffs on notice of the facts that (1) the installation of the Additional Chambers was delayed and (2) this delay was hindering its efforts to hit the benchmarks in the Agreement for CFS's entitlement to the Earn-outs. (*See* Doc. No. 22, ¶¶ 54-56). For example, Plaintiffs allege that Mathis made inquiries regarding the Additional Chambers periodically after closing of the Agreement and was informed of the delay, and also that "[f]rom June 15, 2011," BeamOne and Synergy representatives "repeatedly communicated to Mathis" regarding the negative impact the delayed installation of the Additional Chambers was having on Synergy's operation of the Facility. (*See id.*). Thus, based on Plaintiffs' own allegations, there is no basis to toll the statute of limitations because after the execution of the Agreement, Synergy immediately and affirmatively put Plaintiffs on notice of facts suggesting that any alleged representations regarding the immediate

15

installation of the Additional Chambers, or Synergy's expertise to install them, were false.

Even if Plaintiffs did not concede that they were effectively put on notice of the falsity of the alleged representations regarding the Additional Chambers, given the nature of the alleged fraud, Plaintiffs had notice of the fraud at least three months after the execution of the Agreement, as this was allegedly the timeframe given by Synergy for the installation of the Additional Chambers.  Specifically, Plaintiffs allege that "[a]t all times to prior to contracting," Synergy and BeamOne representatives represented "that the [A]dditional Chambers included in the Agreement would be installed at the Facility during the three months immediately following the Closing Date."  (*Id*. at ¶ 80).  Thus, at least three months after the closing of the Agreement, Plaintiffs were put on notice that these alleged representations were false.  As they still waited more than three years from that point to file suit, their fraud claims are clearly time barred.

       3.    <u>If Mathis Asserts Contract or Fraud Claims, Such Claims are Even More Untimely than CFS's Claims.</u>

To the extent that the any of Plaintiffs' claims seek relief on behalf of Mathis, such claims are even less timely than those filed on behalf of CFS.  This is because Mathis was not a party to the original lawsuit filed in Florida state court in November of 2015, and has only arguably filed a purported claim for the first time in the Amended Complaint filed on February 25, 2016, significantly more than three years after the alleged misrepresentations were made and /or the Earn-outs were due to CFS.  Thus, if Mathis asserts any claims in the Amended Complaint, such claims are time-barred and must be dismissed.

**B.**    **<u>Plaintiffs Fail to State a Cause of Action for Fraud</u>.**

CFS's fraud claim (Count II) is contradicted by the Agreement and fails as a matter of law.  Under Delaware law, the elements of fraud "consist of a false representation of material fact, knowingly made with intent to be believed, to one who, ignorant of its falsity, relies thereon

and is thereby deceived." *Harman v. Masoneilan International, Inc.*, 442 A.2d 487, 499 (Del. 1982). Additionally, the plaintiff's action taken in reliance upon the false representation must be "justifiable." *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

     1.    <u>The Agreement Precludes a Finding that Plaintiffs' Reliance on Extra-Contractual Representations was Justifiable.</u>

Plaintiffs' fraud claim hinges entirely on the allegation that Plaintiffs relied upon representations by Synergy and BeamOne representatives that were not contained in the Agreement: the alleged representations that Synergy would install the Additional Chambers "at the Facility during the three months immediately following the Closing Date" of the Agreement. (Doc. No. 22, ¶ 80).  Critically, however, Plaintiffs acknowledged through the integration clause in the Agreement "that no representations, warranties, inducements, promises or agreements, oral or otherwise," were made by any party to the Agreement which were not embodied in the Agreement.  (Doc. No. 22, p. 54).  This is fatal to Plaintiffs' fraud claim, as Delaware courts have held that "a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006). *See also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n. 18 (Del. Ch. 2003) (citing *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555–56 (Del. Ch. 2001) ("The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.").[6]

---

[6] Additionally, Plaintiffs again fail to allege that their reliance was reasonable or justifiable.  However, dismissal of Count II with prejudice is appropriate because, for the reasons set forth below, leave to amend the Complaint to include these allegations would be futile.  *See, e.g., Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) (citing

Moreover, "[t]he existence of [an integration or merger] clause in a formal written contract between sophisticated parties is, in the absence of unconscionable or other extraordinary circumstances, conclusive evidence that the parties intended the written contract to be their complete agreement." *J.A. Moore Const. Co. v. Sussex Associates Ltd. P'ship*, 688 F. Supp. 982, 987 (D. Del. 1988) (citing FARNSWORTH ON CONTRACTS § 7.3 (1983)).  The policy behind this rule was cogently articulated in *Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382 (Del. Ch. July 9, 2002).   There, the plaintiff, Progressive, sought to rescind a license agreement and brought a fraud claim in which it argued that it had relied upon factual statements made by a defendant, DuPont, that were not incorporated into the license agreement.   *Id*. at *6.   The license agreement contained an analogous integration clause, which read as follows:

> *Integration*. This LICENSE and any attached schedules and exhibits, constitutes the entire agreement between the Parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the Parties. Each of the Parties acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, concerning the subject matter hereof to induce the Party to execute or authorize the execution of this LICENSE, and acknowledges that the Party has not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein [. . .].

*Id*. at *5 (Del. Ch. 2002).

After concluding that the integration clause was conclusive evidence that Progressive intended the license agreement to be the complete agreement, the court dismissed Progressive's fraud claim.  *Id*. at * 7.  Articulating why permitting such claims to go forward would frustrate

*Hall v. United Ins. Co. Of Am*., 367 F.3d 1255, 1263 (11th Cir. 2004)) (holding that leave to amend a complaint is futile when the complaint, even if amended, would still be properly dismissed or immediately subject to summary judgment for the defendant).

the public policy of Delaware and create a troubling precedent for parties to commercial

contracts, the court reasoned:

> When it signed the Agreement, Progressive averred that it had read all its terms and agreed to all its provisions, including the provision stating it was not relying upon any representations outside the four corners of the contract. But Progressive now asserts that it was -- contrary to its promise to DuPont -- relying on cost-of-production representations outside the scope of that Agreement. In essence, Progressive is saying to the court, "Believe us now when we tell you we made a false promise to DuPont then."

> The law cannot sanction this type of argument. DuPont bargained for the promises made in the integration clause. Had Progressive insisted upon the elimination of that clause, DuPont might well have decided not to sign the License Agreement, precisely because it did not want to be subjected to after-the-fact rescission claims premised on oral discussions between the parties that were never formalized into contractual promises.

> If Progressive is allowed to proceed with its fraudulent inducement claims, it will be released from its own breach of the License Agreement, a result that is unreasonable and that creates a troubling precedent for commercial parties forging future contracts. By contrast, if Progressive is expected to live up to its own words, the reasonable expectations of the parties to the License Agreement are enforced and the importance of contractual text is reinforced -- results in keeping with the public policy of this state.

*Progressive*, 2002 WL 1558382 at *10.[7]

Plaintiffs apparently seek to avoid the application of the integration clause in the

Agreement by portraying themselves as the "David" to Synergy's "Goliath." (*See* Doc. No. 22, ¶

49) (alleging that the deal was "tremendously one-sided; pitting Synergy, a sophisticated multi-

million-dollar corporation and their attorneys against a former medical equipment sterilization

consultant with a hard deadline . . . who lacked the opportunity and sophistication to negotiate

the terms of the sale.").  However, not only are Plaintiffs' allegations of their lack of relative

---

[7] Synergy acknowledges that in certain very limited instances not applicable here, Delaware courts have permitted fraud claims premised on extra-contractual representations to go forward despite the presence of integration clauses in the contracts at issue.  In the interest of brevity, Synergy incorporates by reference its discussion of these cases contained in its Motion to Dismiss Counts II and III of the Complaint as though fully set forth herein.  (*See* Doc. No. 14, pp. 11-13).

sophistication and bargaining power unsupported and conclusory, they are also contradicted elsewhere in the Amended Complaint.  (*See, e.g.*, *id.* at ¶¶ 11, 37) (alleging Mathis has "a number of years" of experience in the medical device sterilization field and that "CFS had brought in customers that represented well over $2 million in forecasted annual revenue . . .").  Moreover, Plaintiffs' attempt to now depict themselves as babes in the woods in connections with their dealing with Synergy gain Plaintiffs nothing, as Delaware law does not absolve parties of their contractual obligation merely because they allege that they are unsophisticated.

The sole line of Delaware case law which arguably stands for the proposition that integration clauses do not bar fraud claims by unsophisticated parties "involved simple real estate contracts having boilerplate, unnegotiated disclaimer language."  *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 551 (Del. Ch. 2001) (citing *Norton v. Poplos*, 443 A.2d 1 (Del. 1982)).  Thus, the effect of an integration clause does not turn exclusively on the sophistication of the parties to the contract at issue or their relative bargaining power.  Delaware courts also look to the complexity of the contract and the parties' participation in negotiating the contract.  *See id.* at 555-56 (distinguishing *Norton* and reasoning that "quite different circumstances" were presented where sophisticated parties had carefully negotiated a complex contract after conducting months of due diligence).

Plaintiffs cannot escape the clear fact that the Agreement was a multi-faceted, multi-million dollar contract that was the product of negotiations between the parties and months of due diligence.  It included, for example, not only provisions for the sale of intellectual property and contractual rights, but also a non-competition agreement.  (Doc. No. 22, pp. 37-38, 47-48).  Moreover, the provisions of the Agreement at issue in this action were agreed to by two business

entities: Synergy and CFS.  They did not, for example, involve Mathis selling contractual rights or intellectual property belonging to him individually.  (*Id*. at p. 37).

Simply put, this was not a simple contract of adhesion with boilerplate language presented on a "take it or leave it" basis to an unsophisticated consumer.  This was a contract which was contemplated for several months between corporations in a highly specialized and technical industry, which Plaintiffs admit that Mathis has worked in "for a number of years." (*Id*. at ¶ 11).  Plaintiffs also admit that Mathis assisted Synergy with their due diligence for the Agreement in several different ways and had input on the final language of the Agreement.  (*Id*. at ¶ 31, 52).  Under circumstances such as these, where an allegedly material representation is entirely omitted, without explanation, from a complex, comprehensive contract negotiated between business entities, Delaware law requires that the commercial expectations of the parties be upheld and the plain language of the parties' agreement be enforced, including the integration clause.  As the *Great Lakes* court reasoned, were courts to hold otherwise, the parties' contract would "not be worth the paper it is written on.  To allow [plaintiff] to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements." *Great Lakes*, 788 A.2d at 556.

Alternatively, even if the integration clause is not interpreted to serve as an absolute bar to Plaintiffs' fraud claim, the foregoing facts regarding the complex, comprehensive nature of the Agreement and the amount of money involved render it not justifiable or reasonable as a matter of law for Plaintiffs to have relied on alleged extra-contractual assurances regarding the Additional Chambers.  To borrow the *Progressive* court's reasoning, "[i]t would have been easy for the parties to have addressed [CFS's] concerns with contractual language." *Progressive*,

2002 WL 1558382 at *10.  Having failed to do so, Plaintiffs cannot now be released from their own attempt to disavow the clear terms of the Agreement's integration clause.

    2.    <u>Plaintiffs Fail to Allege a False Representation of Fact.</u>

Under Delaware law, "[g]enerally, prior oral promises or statements of future intent do not constitute 'false representation[s] of fact' that would satisfy the first element of fraudulent misrepresentation." *MicroStrategy Inc. v. Acacia Research Corp*., No. C.A. 5735-VCP, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010).  Rather, a "viable claim of fraud concerning a contract must allege misrepresentations of present facts (rather than merely of future intent) that were collateral to the contract and which induced the allegedly defrauded party to enter into the contract." *Id*. (quoting *Carrow v. Arnold*, No. C.A. 182-K, 2006 WL 3289582, *8 (Del. Ch. Oct. 31, 2006).  Prior oral promises or statements of future intent can only form the basis of a fraudulent inducement claim where the plaintiff "plead[s] *specific facts* that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made." *Id*. (emphasis added) (quoting *Grunstein v. Silva*, No. C.A. 3932-VCN, 2009 WL 4698541, *13 (Del. Ch. Dec. 8, 2009)).

Importantly, merely showing "[a] party's failure to keep a promise does not prove that the promise was false when made." *Berdel, Inc. v. Berman Real Estate Mgmt., Inc*., No. C.A. 13579, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997).  However, "relevant circumstances include a failure to perform, a failure to attempt performance, a repudiation of the promise soon after making it, and the speaker's continued assurances after it is clear the speaker does not intend to perform." *Grunstein*, 2009 WL 4698541 at *13, n. 89 (quoting 9 Stuart M. Speiser et al., The American Law of Torts § 32:27 at 266–67 (2009)).

Here, Plaintiffs only allege in conclusory fashion that Synergy's representatives "had no

intention of ever paying Mathis." (*See* Doc. No. 22, ¶¶ 81, 82, 84).  Plaintiffs do not allege, for example, specific facts suggesting that Synergy failed to attempt to install the Additional Chambers within the period of time allegedly promised.  Nor do they allege any of the other supporting allegations.   In fact, Plaintiffs essentially allege the opposite: that Synergy "repeatedly" communicated to Plaintiffs regarding Synergy experiencing delay in installing the Additional Chambers.  (Doc. No. 22, ¶¶ 54-56).  This does not lead to a reasonable inference that Synergy had no intention of performing its alleged promise to install the Additional Chambers, but instead that Synergy intended to perform when it allegedly made the promise and then encountered unforeseen delays.   Thus, given Plaintiffs' failure to allege either a false representations of present fact or specific facts regarding the allegedly false promises of future intent, their claim for fraud must be dismissed.

   3. <u>Plaintiffs Fail to State the Circumstances Constituting Fraud with Particularity.</u>

"The requirements of the particularity standard are well established: 'The circumstances which shall be stated with particularity in Rule 9(b) refer to the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004).  *See also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003) ("Essentially, to satisfy [the Rule 9(b)] requirement, the plaintiff must allege circumstances sufficient to fairly apprise the defendant of the basis for the claim.").

While Plaintiffs have added several factual allegations to the Amended Complaint which were not contained in the initial Complaint, Plaintiffs still fail to identify with sufficient particularity the alleged false representations that form the basis for the claim.  Plaintiffs have

attached one email from Stephan to Mathis regarding the Additional Chambers, but then go on to allege that additional unidentified assurances were apparently made by other Synergy and BeamOne representatives regarding the Additional Chambers.   (Doc. No. 22, ¶¶ 29-30, 33). However, Plaintiffs fail to allege how these alleged representations regarding the Additional Chambers were made or the specific content of the representations. Dismissal is thus required under Rule 9(b), Fed. R. Civ. P.

**C.**      **Mathis Should be Dismissed, As Neither Claim Seeks Relief on his Behalf.**

As set forth above, Mathis has been added to the case caption of the Amended Complaint, but neither of the causes of action in the Amended Complaint appears to seek any relief on Mathis' behalf.  (*See, e.g.*, Doc. No. 22, ¶¶67, 77, 78, 87).   Rather, the Amended Complaint only alleges that CFS is seeking and owed damages.  (*See id.* at pp. 14, 16).   It is unclear if Mathis has been added to the case caption because Plaintiffs consider him a necessary party or if Plaintiffs seek any relief on his behalf.   Ultimately, because the Amended Complaint does not appear to assert any claims by Mathis in his individual capacity, Synergy is unable to fashion a response to any such causes of actions.   Therefore, to the extent his claim is not time barred, Mathis' claims must still be dismissed from this action or, at minimum, Mathis must be required to clarify what relief, if any, he seeks against Synergy in his individual capacity.

## CONCLUSION

Based on the foregoing, Synergy respectfully requests that this Court dismiss the Amended Complaint (Doc. No. 22) with prejudice for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).   Synergy further requests that this Court grant it any and all other further relief as it deems just and proper.

Respectfully submitted this 14th day of March, 2016.

s/Michael S. Vitale
Denis L. Durkin
Florida Bar No. 237132
ddurkin@bakerlaw.com
Michael S. Vitale
Florida Bar No. 17136
mvitale@bakerlaw.com
Parker G. Jordan
Florida Bar No. 106421
pjordan@bakerlaw.com
**BAKER & HOSTETLER LLP**
2300 SunTrust Center
200 South Orange Avenue
P.O. Box 112
Orlando, FL  32802-0112
Telephone:  407-649-4000
Telecopier:  407-841-0168

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 14, 2016, I electronically filed the foregoing Motion to Dismiss Amended Complaint with Prejudice with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following listed counsel:

Donald Gervase, Esq.
Primary E-Mail:  dgervase@provisionlaw.com
Secondary E-Mail:  jkiss@provisionlaw.com
Provision Law PLLC
310 S. Dillard St. Ste 410
Winter Garden, FL  32787

s/Michael S. Vitale
Michael S. Vitale