**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

CENTRAL FLORIDA STERILIZATION, LLC,

      Plaintiff,

v.                                CASE NO.:  6:15-cv-2120-Orl-31TBS

SYNERGY HEALTH AST, LLC,

      Defendant.

_____/

**DEFENDANT SYNERGY HEALTH AST, LLC'S MOTION TO DISMISS FOURTH AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

      Defendant, Synergy Health AST, LLC ("Synergy"), by and through its undersigned counsel and pursuant to Rule 12(b)(6), Fed. R. Civ. P., hereby moves to dismiss with prejudice the Fourth Amended Complaint filed against it by Central Florida Sterilization, LLC ("CFS"), (Doc. No. 27, filed on May 6, 2016), as it pertains to alleged breaches of Sections 2(c)(iii)(A) and 2(c)(iii)(C) of the Asset Purchase Agreement (the "Agreement"),[1] for failure to state a claim upon which relief can be granted, and in support thereof states as follows:

**I.  INTRODUCTION**

      CFS's Fourth Amended Complaint contains only one count for breach of contract, which relates to alleged breaches of the Agreement entered into in June 2011 between Synergy and CFS.  (*See generally* Doc. No. 27).  CFS's claim is primarily based on its allegation that it was entitled to two (2) payments (the "Earn-outs") pursuant to Sections 2(c)(iii)(A) and 2(c)(iii)(B) of the Agreement, but that Synergy breached the Agreement by wrongfully refusing to pay the

---

[1] As this Court found that CFS's claim with respect to Section 2(c)(iii)(B) of the Agreement was not barred by the statute of limitations at the motion to dismiss stage, (Doc. No. 25, p. 9), this Motion to Dismiss is not directed at CFS's claim for breach of that Section of the Agreement.

Earn-outs to CFS. (*See id*. at ¶¶ 81, 83).[2]  After Synergy moved to dismiss CFS's Amended Complaint, this Court held that CFS's claim regarding Section 2(c)(iii)(A) of the Agreement was barred by the applicable three year Delaware statute of limitations unless a tolling doctrine applied. (Doc. No. 25, pp. 8-9).  Now, in its Fourth Amended Complaint, CFS attempts to plead facts supporting the application of the doctrine of fraudulent concealment in order to toll the statute of limitations with respect to its claim based on an alleged breach of Section 2(c)(iii)(A) of the Agreement. (*See* Doc. No. 27, ¶¶ 55-56, 59-60, 62).  This attempt fails.

CFS's allegations fall woefully short of establishing a basis for fraudulent concealment. First, even if CFS's allegations were sufficient to establish fraudulent concealment, CFS's claims would still be time-barred because the doctrine of fraudulent concealment only operates to toll the limitations period until a <u>plaintiff is put on inquiry notice</u> that his rights under a contract have been violated.  It does not, as CFS appears to assume, toll the statute of limitations until a plaintiff has actual knowledge that a violation has occurred.  Here, it is clear that once Synergy failed to pay the Earn-out that CFS was allegedly entitled to under Section (2)(c)(iii)(A) when it was due on July 15, 2012, CFS was put on notice that it should undertake further inquiry to determine if Synergy's non-payment constituted a breach of the Agreement.  Based on its own allegations, CFS did undertake such inquiry; however, it still waited over three years from the date that the Revenue Earn-out was due to file suit.  Thus, even if the doctrine of fraudulent concealment applied, it would not operate to toll the statute of limitations for a long enough period to render CFS's claim based on Section 2(c)(iii)(A) of the Agreement timely.

---

[2] CFS also alleges in its Fourth Amended Complaint, for the first time, that Synergy breached Section 2(c)(iii)(C) of the Agreement by refusing to provide CFS with financial information that was allegedly requested by CFS's manager and owner, Wes Mathis ("Mathis"), as early as 2011. (*See id*. at   ¶ 82).  As set forth below, this claim is clearly barred by the statute of limitations and belied in significant part by the language of the Agreement.

Moreover, CFS's allegations of fraudulent concealment are insufficient as a matter of law.  In essence, CFS simply slaps a conclusory "fraudulent concealment" label on (1) Synergy's alleged failure to provide CFS with financial information that CFS claims to have requested regarding its alleged entitlement to the Earn-outs and (2) Synergy's statements to CFS that it had not met the performance benchmarks which would entitle CFS to payment of the Earn-outs pursuant to the Agreement.  (*See id*. at ¶¶ 55-56, 59-60, 62, 65-67).   Even taking these allegations as true, Synergy's mere failure to open its books and records to CFS does not constitute fraudulent concealment, nor does Synergy's assertion that the Earn-out benchmarks had not been met.  Finally, although the doctrine of fraudulent concealment does not salvage CFS's untimely claim based on Section 2(c)(iii)(A), CFS nevertheless fails to allege fraudulent concealment with the requisite particularity under Rule 9(b).

Like CFS's Section 2(c)(iii)(A) claim, CFS's new breach of contract claim based on Section 2(c)(iii)(C) of the Agreement is also barred by Delaware's statute of limitations because it is apparently based on Synergy's alleged failure to supply CFS with the information it requested – as early as 2011 – regarding CFS's alleged entitlement to the Earn-outs.  (*See id*. at ¶¶ 55-57, 59, 62).   This claim should also be dismissed because, by its plain terms, Section 2(c)(iii)(C) only narrowly required Synergy to give CFS access to information regarding two defined terms in the Agreement: Synergy's "Capital Expenditures" and "Earnout EBITDA." (*See id*. at ¶ 57).   Yet, CFS appears to allege that Synergy breached this provision in part by failing to provide CFS with information unrelated to these terms, and thus not required to be provided under the Agreement.

## II.  FACTUAL BACKGROUND

### A.    The Agreement

CFS and Synergy entered into the Agreement on June 15, 2011.[3]  Under the Agreement, Synergy agreed to purchase from CFS certain equipment, intellectual property, and contractual rights related to an ethylene oxide sterilization facility in Oldsmar, Florida (the "Facility") for approximately $3 million (the "Purchase Price").  (*See generally* Doc. No. 27 at Exhibit "E," pp. 34-65).   In addition to the Purchase Price, Synergy agreed to pay the Earn-outs to CFS if Synergy achieved certain performance benchmarks related to the facility.   (*Id*. at ¶¶ 48-51). Specifically, under Section 2(c)(iii)(A) of the Agreement, Synergy agreed to pay CFS $335,000 (the "Revenue Earn-out") "[i]f, no later than the 12 month anniversary of the Closing Date," Synergy received service contracts for sterilization services to be performed at the Facility "with forecasted annual revenues from such contracts to [Synergy] in an aggregate amount of at least $1,850,000, as reasonably determined by [Synergy]."  (*Id*. at ¶ 49).  Under Section 2(c)(iii)(B) of the Agreement, Synergy also agreed to pay CFS an amount determined by a formula based on Synergy's return on investment ("ROI") from its operation of the Facility "during the 15 month period commencing on the Closing Date and ending on the date of the 15 month anniversary of the Closing Date" (the "ROI Earn-out").  (*Id*. at ¶¶ 50-51).

The Revenue Earn-out was due to be paid "within thirty (30) days of receipt of the last executed contract that causes the . . . revenue condition to be met."  (*Id*. at p. 40).  However, because the Revenue Earn-out was based on contracts received by Synergy on or before June 15,

---

[3] Although in its Fourth Amended Complaint CFS omitted the allegation contained in its original Complaint that the parties closed on the Agreement on June 15, 2011, (Doc. No. 2, ¶ 16), CFS appears to still acknowledge this date as the closing date of the Agreement for purposes of calculating CFS's entitlement to the Earn-outs.  (*See* Doc. No. 27, ¶¶ 48-51).  This Court has also found, in connection with Synergy's second Motion to Dismiss, that the closing date of the Agreement was June 15, 2011.  (*See* Doc. No. 25, p. 3) (noting that the Earn-out under 2(c)(iii)(A) "was payable 12 months plus thirty days after the closing date of June 15, 2011 . . .").

2012, the latest date for payment of the Revenue Earn-out under the Agreement was July 15, 2012.  The ROI Earn-out was due to be paid "[n]o later than sixty (60) days after the end of the Earnout Period." (*Id*. at p. 40).  As the "Earnout Period" is defined in the Agreement as "the 12 month period commencing on the date of the three (3) month anniversary of the Closing Date and ending on the 15 month anniversary of the Closing Date," the ROI Earn-out was due to be paid by November 15, 2012.  (*Id*. at p. 37).

The formula for calculating Synergy's ROI used to determine the ROI Earn-out is dependent on two variables: Synergy's "Earnout EBITDA" and its "Capital Expenditures."  (*Id*. at p. 40).  Each of these terms is defined in the Agreement.  "Earnout EBITDA" is Synergy's net profit from its operation of the Facility during the Earnout Period before interest, tax, depreciation and amortization of goodwill.  (*Id*. at p. 37).  "Capital Expenditures" are the funds paid by Synergy in connection with the acquisition of the Facility and the start-up of Synergy's operations during the 15 month period after the closing of the Agreement, including, *inter alia*, the Purchase Price, the Revenue Earn-out (if paid to CFS), as well as any equipment, parts, or inventory acquired by Synergy for the operation of the Facility.  (*Id*. at p. 40).

Under Section 2(c)(iii)(C), Synergy agreed to provide CFS access <u>only</u> to Synergy's books and records and work papers that were "prepared in connection with the preparation and calculation of the Capital Expenditures and Earnout EBITDA."  (*Id*. at p. 41).  In full, Section 2(c)(iii)(C) provides that:

> (C) [CFS] shall be entitled to have access to the books and records of [Synergy] and the work papers of [Synergy] prepared in connection with the preparation and calculation of the Capital Expenditures and the Earnout EBITDA and shall be entitled to discuss such books and records, work papers and calculations with Buyer and those persons responsible for the preparation thereof.

(*Id*.).

**B.      Synergy's Alleged Fraudulent Concealment of its Breach of the Agreement**

While Synergy was required to pay the Revenue and ROI Earn-outs (if the relevant performance benchmarks were met) on July 15, 2012 and November 15, 2012, respectively, CFS appears to claim that it was prevented from discovering that Synergy breached the Agreement until June of 2015 – **over three years** after Synergy withheld payment of the first Earn-outs. (*See* Doc. No. 27, ¶¶ 70, 82).  CFS claims that it was prevented from discovering the breaches of the Agreement primarily because Synergy allegedly refused to provide CFS with certain information that it allegedly requested regarding the benchmarks that the Earn-outs were tied to. (*See id*. at ¶ 60).   CFS also claims that Synergy's alleged refusal to provide this information constituted a breach of Section 2(c)(iii)(C) of the Agreement.  (*Id*. at ¶ 82).

Critically, CFS does not allege that Synergy made any affirmative misrepresentations designed to prevent, and which did prevent, CFS from discovering alleged breaches of the Agreement from CFS.  Rather, CFS's fraudulent concealment theory appears to be entirely based on (1) Synergy's alleged failure to provide CFS information that it requested after the June 2011 closing of the Agreement regarding Synergy's operations of the Facility and the Earn-out benchmarks and (2) Synergy's alleged statements to CFS that the Earn-out benchmarks had not been met.  (*See id*. at ¶¶ 55-56, 59-60, 62, 65-67).  Specifically, CFS alleges that after the closing of the Agreement, Mathis "continuously" asked Larry Gabele ("Gabele"), then BeamOne, LLC's ("BeamOne") CFO,[4] for certain information including "progress updates" on the installation of additional sterilization chambers (the "Additional Chambers") at the Facility,[5] "the list of new customer contracts and letters of intent Synergy signed with customers," and "information

---

[4] BeamOne was acquired by Synergy in early 2011, and thus representatives from both BeamOne and Synergy were involved in the due diligence and negotiation of the Agreement.  (*Id*. at ¶ 35, p. 21).

[5] CFS alleges that the parties to the Agreement understood that the installation of the Additional Chambers was necessary for Synergy to be entitled to the ROI Earn-out.  (*Id*. at ¶ 54).

regarding the profitability of the Facility." (*Id*. at ¶¶ 55-56).  While CFS claims that Synergy did not provide this information, CFS does allege that Synergy:

- Informed Mathis that the installation of the Additional Chambers was delayed (*Id*. at ¶ 55);

- Informed Mathis that the delay in installing the Additional Chambers was "hindering Synergy's efforts to sign service contracts with customers" (*Id*.);

- Informed Mathis that the delay in installing the Additional Chambers was "hindering [Synergy's] efforts to produce a positive ROI" (*Id*. at ¶ 56);[6]

- Informed Mathis, "[a]fter the earn-out timeframes contemplated in the Agreement," that Mathis would not be paid either Earn-out (*Id*. at ¶ 58); and

- Informed Mathis that "Synergy didn't hit the numbers they need to hit" to be paid the Earn-outs.  (*Id*. at ¶ 59).

Thus, based on CFS's own allegations, Synergy not only gave CFS notice before the deadline for payment of the Earn-outs that the alleged delay in installing the Additional Chambers was hindering Synergy's ability to hit the Earn-out benchmarks, but Synergy also informed CFS after the deadline for payment of the Earn-outs that the Earn-out benchmarks in fact had not been met and that CFS would not be paid the Earn-outs.  (*See id*.).  CFS alleges, however, that because Synergy refused to provide CFS with the information it had requested, it could not "verify" whether Synergy's non-payment of the Earn-outs constituted a breach of the Agreement.  (*See id*. at ¶ 60).  CFS alleges that it continued to "request Synergy's records regarding the Facility's revenues as late as February of 2013" but that Synergy never provided these records and soon stopped returning Mathis' phone calls.  (*Id*. at ¶ 62).

CFS claims that it was not until Mathis visited the Facility in October 2014 – approximately two years after the Earn-outs were allegedly due – that Mathis was first able to

---

[6] CFS does not appear to contest the veracity of these representations regarding the delay in installing the Additional Chambers, as CFS alleges that "Synergy did not complete the installation of the additional sterilization chambers at the Facility until after September 15, 2012, which delayed the installation of the additional chambers until <u>after</u> the times contemplated in both Section 2(c)(iii)(A) and Section 2(c)(iii)(B) of the Agreement . . ." (*Id*. at ¶ 61).

"verify the Agreement had been breached" and "that he may have a claim against Synergy." (*Id*. at ¶ 67). Specifically, CFS alleges that during this visit, Mathis "discovered" that the Facility was operating at full capacity and that Synergy was "processing the volume of business Gabele and [Tom] Stephan[7] denied Synergy achieved." (*Id*. at ¶ 65). CFS alleges that had Gabele and Stephan not concealed this information, it "would have proven that CFS was entitled to receive the earn-outs contemplated in Section 2(c)(iii)(A) of the Agreement." (*Id*.). This is apparently because CFS alleges that "the Facility's operation capacity in October of 2014 was generated by customer contacts signed prior to June 15, 2012" and that the forecasted annual revenues from these contracts allegedly met the Revenue Earn-out threshold. (*Id*. at ¶ 66).

While the October 2014 visit to the Facility allegedly revealed that Synergy was "processing the volume of business it had denied [it] achieved" and that it had breached the Agreement, CFS also alleges that it was not until a June 2015 meeting that Mathis "discovered that Synergy had concealed the evidence proving CFS was entitled to the earn-out in Section 2(c)(iii)(A) of the Agreement, and that Synergy had breached the Agreement." (*Id*. at ¶ 70). At this meeting between Mathis and Synergy's Finance Director, Marc Garofani ("Garofani"), Garofani allegedly showed Mathis "a portion of the financial information [Mathis] had requested." (*Id*. at ¶ 69). During this meeting, Garofani also allegedly told Mathis that neither of the benchmarks for payment of the Earn-outs had been met and that CFS would not be paid either Earn-out. (*See id*. at ¶¶ 69, 75-76).

### III. PROCEDURAL HISTORY

This case was originally filed in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida on November 6, 2015, and removed to this Court on December 18,

---

[7] Tom Stephan ("Stephan") was BeamOne's Vice President at the time of the negotiation of the Agreement. (*See id*. at ¶ 32).

2015.  (*See* Doc. No. 1, ¶ 2).  The initial Complaint included three causes of action.  (*See* Doc. No. 1-1).  On January 19, 2016, Synergy moved to dismiss Count II (good faith and fair dealing) and Count III (fraud) of the original complaint.  (Doc. No. 14).  On February 10, 2016, the Court entered an Order dismissing Count II with prejudice, and Count III with leave to amend.  (Doc. No. 20).  As the Court recognized in its Order, Synergy argued, and CFS did not dispute, that Delaware substantive law applies to this case based on the express Delaware choice of law provision of the Agreement.  (*Id.* at p. 5).[8]

After the Complaint was dismissed, the Amended Complaint was filed on February 25, 2016.  (Doc. No. 22).  On March 14, 2016, Synergy moved to dismiss both causes of action in the Amended Complaint with prejudice based on, *inter alia*, Delaware's three year statute of limitations applicable to both claims.  (*See* Doc. No. 23).  Synergy also moved to dismiss Mathis, who was added as a party.  (*Id.*).  On April 19, 2016, the Court entered an Order dismissing Mathis and CFS's fraud claim with prejudice.  (*See* Doc. No. 25).

In its April 19, 2016 Order, the Court also held that "the Delaware statute of limitations applies in the instant case."  (*Id.* at p. 8).   In applying Delaware's three year statute of limitations, the Court held that, unless a tolling doctrine applied, CFS's breach of contract claim based on Section 2(c)(iii)(A) of the Agreement was time-barred because it accrued when the Revenue Earn-out was due on July 15, 2012 – more than three years prior to the date CFS filed this suit.  (*Id.* at p. 9).  Thus, the Court dismissed CFS's breach of contract claim regarding Section 2(c)(iii)(A) "with leave to amend the Complaint to show the basis for [CFS's] argument that the statute of limitations was tolled until November 6, 2015."  (*Id.* at pp. 11-12).

---

[8] The Agreement states: "[t]he laws of the state of Delaware (without giving effect to its conflicts of laws principles) govern all matters arising out of or relating to this Agreement all of the transactions it contemplates, including without limitation, its validity, interpretation, construction, performance, and enforcement."  (Doc. No. 27, p. 55).

## IV.  STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion to dismiss, a court must accept the allegations in the complaint as true and construe them in a light most favorable to the plaintiff.  Fed. R. Civ. P. 12(b)(6).  To satisfy the pleading requirements of Fed. R. Civ. P. 8, a complaint must give the defendant fair notice of what the plaintiff's claims are and the grounds upon which they rest. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (citation omitted).

A plaintiff is required to allege the grounds of its entitlement to relief with "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *See Lewis v. Seneff*, 654 F. Supp. 2d 1349, 1354 (M.D. Fla. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  A plaintiff "must plead enough facts to state a plausible, and not merely conceivable, basis for the claim."  *See id.* at 1355 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Twombly*, 550 U.S. at 556).   "Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense."  *Id.*

To determine whether the Complaint states a claim, the scope of the Court's review is limited to the four corners of the complaint, which includes any attached exhibits.  *Cruz v. Underwriters at Lloyd's London*, No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at *2 (M.D. Fla. Aug. 1, 2014); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  In the event a complaint's allegations contradict an attached exhibit, the exhibit controls.  *Id.*  "Dismissal is also warranted under Rule 12(b)(6) if, assuming the truth of the factual allegations of a plaintiff's complaint, there remains a dispositive legal issue which precludes relief."  *Lewis*, 654 F. Supp. 2d at 1355.  Indeed, a court

may dismiss a complaint under Rule 12(b)(6) when the plaintiff's allegations indicate the existence of an affirmative defense. *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993).

## V. ARGUMENT

As this Court has recognized, Delaware law sets a three year statute of limitations for breach of contract claims. (*See* Doc. No. 25, p. 8) (citing Delaware Code Title 10, Section 8106(a)). When, as here,

> [A] complaint asserts a cause of action that on its face accrued outside the statute of limitations ... the plaintiff has the burden of pleading facts leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies. Thus, at the motion to dismiss stage this Court conducts a three part analysis to determine whether a claim is time-barred. From the pleadings, the Court determines (1) the date of accrual of the cause of action based on the allegations, (2) if the plaintiff has pleaded facts sufficient to create a reasonable inference that the statute of limitations has been tolled, and (3) assuming a tolling exception has been pleaded adequately, when the plaintiff was on inquiry notice of a claim based on the allegations.

*Vichi v. Koninklijke Philips Elecs. N.V.*, CIV.A. 2578-VCP, 2009 WL 4345724, at *15 (Del. Ch. 2009) (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, CIV.A. 3088-VP, 2008 WL 5352063, at *14 (Del. Ch. 2008)).

The Court has already determined that CFS's breach of contract claim based on Synergy's nonpayment of the Revenue Earn-out allegedly due under Section 2(c)(iii)(A) of the Agreement accrued on July 15, 2012 – the latest date for payment of the Revenue Earn-out under the Agreement. (Doc. No. 25, p. 9). Thus, only the second and third parts of the above three part analysis are at issue here: whether CFS has pled facts sufficient to create a reasonable inference that the statute of limitations has been tolled and, if a tolling doctrine applies, when CFS was on inquiry notice of its claim.

**A.**     **CFS was on Inquiry Notice of its Claim More Than Three Years Before it Filed Suit.**

CFS's breach of contract claim based on Synergy's failure to pay the Revenue Earn-out allegedly due under Section 2(c)(iii)(A) of the Agreement is time-barred regardless of whether CFS can meet its burden of establishing that the doctrine of fraudulent concealment applies in this case.  Under the doctrine of fraudulent concealment, the statute of limitations begins to run "upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."  *Vichi*, 2009 WL 4345724, at *15 (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del. 2004)) (emphasis in original).  In other words, "actual knowledge of the wrong" is not required.  *Id.* at *17.  Thus, the limitations period will begin to run "when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice."  *In re Dean Witter P'ship Litig.*, 24 Del. J. Corp. L. 203, *6 (Del. Ch. 1998) (emphasis in original).

Here, it is clear that CFS was put on inquiry notice of Synergy's alleged breach of the Agreement with respect to Section 2(c)(iii)(A) once Synergy failed to pay the Revenue Earn-out when it was allegedly due.  CFS, however, waited more than three years from this date to initiate this suit.  Thus, CFS's breach of contract claim with respect to Section 2(c)(iii)(A) is time-barred irrespective of whether it can establish that the alleged breach was fraudulently concealed prior to the deadline for payment of the Revenue Earn-out.  CFS's repeated and conclusory allegations that it was unable to "verify" whether the Agreement was breached miss the mark.  (*See, e.g.*, Doc. No. 27, ¶¶ 60, 67).  What matters is that once Synergy failed to pay the Revenue Earn-out when allegedly due, CFS reasonably could, or should, have suspected that this was a possible breach of the Agreement.  Thus, the statute of limitations began running at that point.

Under Delaware law, "having all of the facts necessary to articulate the wrong is *not* required.  Rather, '[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice.'" *In re Dean Witter P'ship Litig.*, 24 Del. J. Corp. L. 203 at * 7, n. 49 (quoting *Harner v. Prudential Secs. Inc.,* 785 F.Supp. 626, 633 (E.D. Mich. 1992)).  *See also Pomeranz v. Museum Partners, L.P.*, CIV. A. 20211, 2005 WL 217039, at *12 (Del. Ch. 2005) ("Contrary to the plaintiffs' assertion here, they may not simply wait until the details of the harm are provided to them before the statute begins to run.").  In the breach of contract context, Delaware courts have noted that it is not necessary that a plaintiff "know he had a claim for breach of contract" in order to be on inquiry notice.  *See Norman v. Elkin*, CV 06-005-LPS, 2015 WL 4886049, at *3 (D. Del. 2015).  Rather, all that is required is that a plaintiff "know enough to put him on notice that he should undertake further inquiry, in order to determine if a wrong had been committed against him. That is inquiry notice." *Id*.

Objectively, once Synergy failed to pay the Revenue Earn-out to CFS by the July 15, 2012 deadline, CFS was at least on notice that it should undertake further inquiry to determine whether the Agreement had been breached.  In fact, based on CFS's own allegations, CFS did undertake such inquiry by "request[ing] the Facility's financials and any proof which would substantiate Synergy's refusal to pay CFS that (sic) earn-outs [Mathis] claimed were due . . ." (Doc. No. 27, ¶ 59).  While CFS alleges that Synergy never provided all of the records it requested, this only makes clearer that CFS – allegedly denied access to the Earn-outs <u>and</u> proof that the Earn-out benchmarks in the Agreement had not been met – was on inquiry notice of a potential breach of the Agreement.

Nonetheless, CFS never attempted to compel the production of Synergy's records showing that the Earn-out benchmarks had not been met – records that CFS now claims it was entitled to under Section 2(c)(iii)(C) of the Agreement – and merely waited over three years from the deadline for payment of the Revenue Earn-out to file suit.   Under these facts, a tolling doctrine will not operate to salvage CFS's untimely claims.   *See Certainteed Corp. v. Celotex Corp.*, CIV. A. 471, 2005 WL 217032, at *7 (Del. Ch. 2005) (noting that the Delaware Supreme Court has "emphasized that <u>a plaintiff is expected to act with alacrity once she has reason to suspect that her rights have been violated</u>, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury.") (emphasis added); *Pomeranz*, 2005 WL 217039, at *12 ("Delaware law expects some initiative from plaintiffs . . ."); *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007) (" . . . no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.   Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.") (internal citations omitted).

Here, CFS should not have been fooled.   CFS participated in weeks of due diligence for the Agreement, was well aware of the payment provisions and time frames for payment, and was in constant communication with representatives from Synergy.   CFS cannot now use a patently inapplicable fraudulent concealment theory to salvage its time-barred claim.   CFS's claim based on Section 2(c)(iii)(A) of the Agreement should be dismissed with prejudice.

**B.**      **CFS's Fraudulent Concealment Allegations are Legally Insufficient.**

Fraudulent concealment is one of the three "narrowly carved out limited circumstances"

in which Delaware courts have permitted the statute of limitations period to be tolled.  *See*

*Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006).  The party asserting that one of

these doctrines applies "bear[s] the burden of pleading specific facts to demonstrate that the

statute of limitations was, in fact, tolled."  *In re Dean Witter P'ship Litig.*, 24 Del. J. Corp. L. 203

at * 6.  Critically,

> To prevail on fraudulent concealment under Delaware law, a plaintiff must prove
> that the defendant "knowingly acted to prevent [the] plaintiff from learning facts
> or otherwise made misrepresentations intended to 'put the plaintiff off the trail of
> inquiry.'" Mere silence is insufficient to establish fraudulent concealment. Rather,
> the evidence must show that the defendant engaged in some sort of "actual
> artifice" to toll the running of the limitations period.

*Krahmer v. Christie's Inc.*, 606-N, 2006 WL 4782304, at *5 (Del. Ch. 2006) (emphasis added)

(internal citations omitted).  *See also Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 176

(Del. Super. 1986) (quoting 54 C.J.S. "Limitation of Actions," § 206 at 226-28) ("Mere silence

or failure to disclose does not constitute such fraudulent concealment as will suspend operation

of [a statute of limitations]. Some actual trick or artifice to prevent knowledge of the fact or

inquiry with respect thereto, some affirmative act of concealment, or, as sometimes stated, some

act of negligence so gross as to be equivalent to intentional fraud, or some misrepresentation to

exclude suspicion and prevent inquiry, and which, according to the decisions on the question,

actually prevents discovery, must be show.") (emphasis added).

Based on the foregoing, it is clear that CFS cannot establish fraudulent concealment

based merely on Synergy's alleged failure to provide CFS with records or information that it

requested or Synergy's alleged failure to communicate with CFS.  These allegations do not

involve affirmative acts of concealment, but are based simply on Synergy's silence or its failure

to disclose information.  Moreover, the only allegations in the Fourth Amended Complaint that

CFS appears to offer in support of its fraudulent concealment theory that arguably go beyond mere silence or nondisclosures are contradictory, vague, and insufficient.

Essentially, CFS claims that in response to its inquiries regarding Synergy's operations of the Facility and the Earn-out benchmarks, Synergy first informed CFS that the alleged delays in installing the Additional Chambers were hindering its ability to achieve the Earn-out benchmarks. (*See* Doc. No. 27, ¶¶ 55-56). Then, after the deadline for payment of the Earn-outs passed, CFS alleges that Synergy's only response to CFS's requests for proof that the Earn-out benchmarks had not been met "was to tell Mathis that Synergy didn't hit the numbers they needed to hit." (*Id*. at ¶ 59). With respect to the first set of alleged representations regarding the impact of the delayed installation of the Additional Chambers on CFS's entitlement to the Earn-outs, it is unclear how these representations would toll the statute of limitations, as CFS does not appear to contest their accuracy. CFS alleges that Synergy intentionally delayed installing the Additional Chambers until after the timeframes for determining the Earn-outs passed. (*Id*. at ¶ 61). Thus, if anything, Synergy's alleged representations that this delay was hindering its ability to achieve the Earn-out benchmarks gave CFS actual notice of potential claims that CFS may have regarding the Earn-outs. These alleged representations certainly cannot be characterized as having put CFS "off the trail of inquiry."

Likewise, Synergy's representations to CFS that Synergy "didn't hit the numbers [it] needed to hit" cannot establish fraudulent concealment. Essentially, through these alleged representations, Synergy denied that its failure to pay the Earn-outs constituted a breach of the Agreement since the Earn-out benchmarks were not met. If this was all that was required to establish fraudulent concealment, the "narrowly carved out" exception to the statute of limitations would swallow the rule. Indeed, courts have held that the "mere denial of

wrongdoing . . . does not qualify as an affirmative act of concealment." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854-55 (N.D. Ill. 2010). *See also King & King Enterprises v. Champlin Petroleum Co.*, 446 F. Supp. 906, 912 (E.D. Okla. 1978) ("A denial of an accusation of wrongdoing does not constitute fraudulent concealment.").[9]   Simply put, CFS cannot claim that it was actually prevented from discovering a breach of the Agreement simply because Synergy represented that the Earn-out benchmarks were not met, and therefore its non-payment of the Earn-outs did not constitute a breach of the Agreement. *See Eden v. Oblates of St. Francis de Sales*, 04C-01-069 CLS, 2006 WL 3512482, at *6 (Del. Super. 2006) (quoting *Nardo v. Guido DeAscanis & Sons, Inc.*, 254 A.2d 254, 256 (Del. Super. 1969)) ("Delaware courts have held that fraudulent concealment also requires 'something affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to a cause of action.'") (emphasis added).[10]

In sum, CFS fails to meet its burden of pleading specific facts sufficient to create a reasonable inference that the doctrine of fraudulent concealment applied to toll the statute of limitations in this case.   CFS cannot show any affirmative acts of concealment that were designed to "exclude suspicion or prevent inquiry," nor has CFS articulated how any affirmative acts actually prevented it from discovering the facts giving rise to its cause of action.   Ultimately, CFS's allegations make clear that if it was prevented from discovering the facts allegedly giving rise to its cause of action, it was prevented from doing so by its own lack of diligence, not any of Synergy's alleged representations or nondisclosures.

---

[9], Synergy researched and could not find a Delaware case squarely on point, but the cited federal court authorities deal with similar scenarios and should be deemed highly persuasive to the instant case.

[10] Nor can CFS claim that its reliance on this representation was reasonable under the circumstances, as Synergy did not, for example, owe CFS any fiduciary duties. *See, e.g., Nat'l Music Centers of Am., Inc. v. Kimball Intern., Inc.*, Case No. 84-1289, 1990 WL 157374 (M.D. Pa. 1990).

C.   **CFS Fails to State the Circumstances Constituting Fraudulent Concealment with Particularity.**

Under both federal procedural and Delaware law, allegations of fraudulent concealment necessary to toll the statute of limitations must be set forth with particularity.  *E.g., Summerhill v. Terminix, Inc.*, 637 F.3d 877, 879 (8th Cir. 2011); *Boeing By Levit v. Shrontz*, 18 Del. J. Corp. L. 225, 233 (Ch. 1992).   The language of Delaware's Chancery Court Rule 9(b) is substantially similar to that of Federal Rule of Civil Procedure 9(b).   Chancery Court Rule 9(b) provides in pertinent part that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."   "Cases interpreting the [Chancery Court] Rule 9(b) requirement have held that a complaint must allege '(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations.'"   *CSH Theatres, LLC v. Nederlander of San Francisco Associates*, CV 9380-VCP, 2015 WL 1839684, at *22 (Del. Ch. 2015) (quoting *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

The Fourth Amended Complaint is patently unclear regarding precisely when and where the alleged fraudulent concealment occurred.   For instance, CFS merely alleges that "[a]fter closing" Mathis "continuously" requested, but was denied, certain information.  (Doc. No. 27, ¶¶ 55-56).   It is unclear from the Fourth Amended Complaint how and when these requests were made, as well as the specific content of the responses that CFS did receive from Synergy.   CFS is also unclear on the specific role that each Synergy representative allegedly played in the fraudulent concealment.   CFS first alleges that it was Gabele who represented to CFS that Synergy did not hit the Earn-out benchmarks, but then CFS claims that, at some unspecified time and place, both Gabele and Stephan apparently denied that Synergy had achieved the volume of

business it was processing.  (*Id*. at ¶¶ 59, 65).  CFS has failed to plead its fraudulent concealment allegations with sufficient particularity, warranting dismissal.

D.    **CFS's New Claim for Breach of Section 2(c)(iii)(C) of the Agreement is Time-Barred and Belied by the Language of the Agreement.**

In a transparent attempt to buttress its fraudulent concealment allegations, CFS alleges in its Fourth Amended Complaint – for the first time in this litigation – that Synergy breached Section 2(c)(iii)(C) of the Agreement by "refusing to provide Mathis with the financial information he had repeatedly requested from Gabele."  (Doc. No. 27, ¶ 82).  CFS claims that this breach "prevented Mathis from discovering the breach [of Section 2(c)(iii)(A) of the Agreement] until almost three years after the earn-out time calculated in the Agreement."  (*Id*.). Not only does this new claim provide zero support for CFS's fraudulent concealment theory,[11] but because CFS is raising it for the first time in May of 2016 – despite the fact that it is based on requests for information made as early as 2011 – it is even more untimely than the claims CFS has asserted previously.    Additionally, CFS's claim for breach of Section 2(c)(iii)(C) is foreclosed, at least in significant part, by the plain language of Section 2(c)(iii)(C).

As previously set forth in Synergy's Motion to Dismiss CFS's Amended Complaint, "[u]nder Delaware law, the [three year] statute of limitations for breach of contract claims begins to run when the contract is breached."  *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 80 (D. Del. 2002) (citing *Freedman v. Beneficial Corp*., 406 F.Supp. 917, 923 (D. Del. 1975)).  CFS's claim regarding an alleged breach of Section 2(c)(iii)(C) is apparently based on Synergy's failure to provide CFS with information that it allegedly "continuously" requested after the closing of the Agreement <u>in June of 2011</u>.  (Doc. No. 27, ¶ 55).  Moreover, this claim was not asserted until

---

[11] In fact, as set forth above, this claim weakens CFS's fraudulent concealment theory because CFS now essentially admits that when it was allegedly denied information and records in 2011, it had a mechanism for compelling this information from Synergy that it failed to even attempt to utilize.

CFS filed its Fourth Amended Complaint on May 6, 2016.  (*See id*.).  While the Agreement did not provide a specific timeframe under which Synergy was required to provide CFS with the information described in Section 2(c)(iii)(C), under Delaware law, "[w]hen a contract is silent as to time of performance, the Court will imply a reasonable period of time under the circumstances."  *AFH Holding Advisory, LLC v. Emmaus Life Scis., Inc.*, CIV.A. N12C-09045MMJ, 2013 WL 2149993, at *10 (Del. Super. 2013).

Here, even if the Court were to somehow find that six months, a year, or even eighteen months was a "reasonable period of time under the circumstances" for Synergy to provide information that CFS allegedly requested and was entitled to under the Agreement, CFS's claim under Section 2(c)(iii)(C) would still be time-barred because it would have accrued well before more than three years prior to the date CFS first asserted its claim for breach of Section 2(c)(iii)(C)).  Moreover, even if CFS takes the position that Section 2(c)(iii)(C) was not breached until the final Earn-out was due, CFS still waited more than three years from that date – November 15, 2012 – to first assert its claim for breach of Section 2(c)(iii)(C).

In addition to being untimely, CFS's claim based on Section 2(c)(iii)(C) is an exceedingly overbroad interpretation of the Agreement belied by its express language.  As set forth above, Section 2(c)(iii)(C) only required Synergy to provide CFS with access to Synergy's books and records and work papers that were "prepared in connection with the preparation and calculation of the <u>Capital Expenditures</u> and <u>Earnout EBITDA</u>."  (Doc. No. 27, p. 41) (emphasis added).  These defined terms were used in connection with determining the ROI Earn-out, and relate to Synergy's net profit from its operation of the Facility and the funds paid by Synergy in connection with the acquisition of the Facility and the start-up of Synergy's operations of the Facility (*Id*. at pp. 37, 40).  CFS's claim, however, appears to be based on Synergy's alleged

failure to provide information and records unrelated to Synergy's Capital Expenditures or its Earnout EBITDA.  (*Id*. at ¶ 55).  For instance, CFS alleges that it requested "progress updates" on the installation of the Additional Sterilization at the Facility and "the list of new customer contracts and letters of intent Synergy signed with customers."  (*Id*.).  CFS alleges that Synergy never complied with these requests even though it was obligated to supply this information under Section 2(c)(iii)(C).  (*Id*. at ¶ 57).  The plain language of Section 2(c)(iii)(C), however, clearly did not obligate Synergy to supply this information.  In fact, much of the information that Synergy is claiming entitlement to, such as the customer lists it allegedly requested, relates to the Revenue Earn-out, not the ROI Earn-out.  Section 2(c)(iii)(C) simply did not entitle CFS to this information.

## VI.  CONCLUSION

Based on the foregoing, Synergy respectfully requests that this Court dismiss with prejudice the Fourth Amended Complaint (Doc. No. 27), as it pertains to alleged breaches of Sections 2(c)(iii)(A) and 2(c)(iii)(C) of the Agreement, pursuant to Rule 12(b)(6).  Synergy further requests that this Court grant it any and all other further relief as it deems just and proper.

Respectfully submitted this 23rd day of May, 2016.


*s/Michael S. Vitale*
Denis L. Durkin
Florida Bar No. 237132
ddurkin@bakerlaw.com
Michael S. Vitale
Florida Bar No. 17136
mvitale@bakerlaw.com
Parker G. Jordan
Florida Bar No. 106421
pjordan@bakerlaw.com

**BAKER & HOSTETLER LLP**
2300 SunTrust Center
200 South Orange Avenue
P.O. Box 112
Orlando, FL 32802-0112
Telephone: 407-649-4000
Telecopier: 407-841-0168

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on May 23, 2016, I electronically filed the foregoing *Motion to Dismiss Fourth Amended Complaint with Prejudice* with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following listed counsel:

Donald Gervase, Esq.
Primary E-Mail: dgervase@provisionlaw.com
Secondary E-Mail: jkiss@provisionlaw.com
Provision Law PLLC
310 S. Dillard St. Ste 410
Winter Garden, FL 32787

*s/Michael S. Vitale*
Michael S. Vitale