**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CENTRAL FLORIDA STERILIZATION, LLC,**

      **Plaintiff,**

v.                                  Case No:   6:15-cv-2120-Orl-31TBS

**SYNERGY HEALTH AST, LLC,**

      **Defendant.**

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 39) filed by the Defendant, Synergy Health AST, LLC (henceforth, "Synergy"), the response in opposition (Doc. 45) filed by the Plaintiff, Central Florida Sterilization, LLC ("CFS"), and the reply (Doc. 46) filed by Synergy.

**I.     Background**

In 2011, Synergy bought a medical device sterilization facility in Oldsmar, Florida from CFS.  (Doc. 39 at 2).   The transaction was governed by an Asset Purchase Agreement ("APA") entered into by CFS, Synergy, and Wes Mathis, who was the manager, president and sole shareholder of CFS.   In addition to the purchase price of $3.3 million, Synergy agreed to pay CFS two bonuses if the Oldsmar Facility achieved certain financial goals in the months after the purchase.  As described in more detail *infra,* the first bonus – the "Revenue Bonus" – was to be paid if Synergy had forecasted annual revenues of $1.85 million within the first 12 months after the transaction closed, while the second – the "Earnout Bonus" – was to be paid if Synergy had a positive return on its investment within the first 15 months after the sale.

In 2012, Synergy notified CFS that the Oldsmar Facility had not achieved either goal, and therefore neither bonus would be paid. (Doc. 39 at 8). On November 6, 2015, CFS filed the instant suit in state court. On November 18, 2015, Synergy removed the case to this court. In its Fourth Amended Complaint (Doc. 27), which is the operative pleading, CFS asserts a single count for breach of contract, arguing that the requirements were met as to both bonuses, and therefore Synergy was obligated to make the payments.

**II.     Legal Standard**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* The party opposing a motion for summary

judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### III. Analysis

Synergy argues that it is entitled to judgment on the merits as to both bonuses. The arguments as to each bonus will be addressed in turn. Before doing so, the Court notes that both parties agree that, pursuant to the terms of the APA, this dispute is governed by Delaware law. (Doc. 39-1 at 22). In addition, the time periods for both bonuses are measured by reference to the "Closing Date" – *i.e.,* the date the sale of the Oldsmar Facility was finalized. Synergy asserts, and CFS does not dispute, that the Closing Date was June 15, 2011. (Doc. 39 at 2 n. 1).

#### A. Revenue Bonus

The prerequisites for payment of the Revenue Bonus were set forth in Section 2(c)(iii)(A) of the APA, which provided as follows:

> If, no later than the 12 month anniversary of the Closing Date, Buyer has received **service contracts executed by customers for sterilization services to be performed at the Property with forecasted annual revenues from such contracts to Buyer in an aggregate amount of at least $1,850,000**, as reasonably determined by Buyer, Buyer shall, within thirty (30) days of receipt of the last executed contract that causes the foregoing revenue condition to be met, pay to Seller in accordance with delivery instructions provided by Seller to Buyer an amount equal to $335,000 in cash. Nothing herein shall be construed as obligating Buyer to accept or execute

> any customer service contract unless the terms of such service contract are otherwise reasonably acceptable to Buyer.

(Doc. 39-1 at 7) (emphasis added).   The term "Property" in Section 2(c)(iii)(A) refers to the Oldsmar Facility.

Synergy asserts that it received only two signed customer service contracts prior to June 15, 2012, the 12-month anniversary of the Closing Date.   The first such contract was with Medline Industries ("Medline"), while the other was with Stryker Sustainability Solutions ("Stryker").   Synergy estimated that the contract with Medline would generate $24,000 in revenue the first year (Doc. 39 at 6) and that the contract with Stryker would generate $561,000 per year (Doc. 39 at 8).   Combined, the two contracts totaled only $585,000 in forecasted annual revenue, well short of the $1,850,000 threshold needed to trigger payment of the Revenue Bonus.

CFS argues that Synergy is improperly relying on the amounts it actually realized from its contracts, rather than the forecasted estimates, as called for in the APA.   (Doc. 45 at 4-5).   CFS is incorrect.   Synergy does set out the amounts actually earned under those agreements (Doc. 39 at 6), but it appears to be doing so to show that its forecasts were "reasonably determined," as required by Section 2(c)(iii)(A).   In any event, Synergy is not relying on those figures to show that the threshold for payment of the Revenue Bonus was not crossed.

CFS cites figures from various Synergy documents that, it says, "directly contradict[s]" Synergy's position regarding payment of the Revenue Bonus.   When examined closely, however, none of them support CFS's argument that the requirements set forth in Section 2(c)(iii)(A) had been met.   CFS first points to a document (apparently a printout of a slide presentation) titled "Revenue Growth Strategies Americas."   The document was prepared by the CEO of Synergy's Americas division, Glenn Thibault, in November 2011.   CFS asserts that, on page 16 of that document, Thibault "forecasted revenue growth for the [Oldsmar] Facility as $1.5 million."

(Doc. 45 at 5).  CFS neglects to point out that the time frame set forth for this forecast was 2012-2013, rather than June 2011 to June 2012, the period that was relevant to payment of the Revenue Bonus.  (Doc. 45-3 at 17).  Given the scant amount of information presented on the slide, it is impossible to tell if the $1.5 million figure is an actual forecast, or merely a target, or something else.  Moreover, $1.5 million in forecasted annual revenue would still fall short of the $1.85 million threshold required to trigger the Revenue Bonus payout.

CFS next notes that, in late 2011, Arthrex Manufacturing, Inc. (henceforth, "Arthrex"), signed a "Processing Letter of Intent and Supplier Agreement" with Synergy regarding the Oldsmar Facility.  (Doc. 45 at 5).  In addition, CFS points out that on December 11, 2011, Thibault produced a monthly report in which he stated that the Medline contract "could be worth $500K" and that the Arthrex account "is the big win as that contract could be worth $2.0 Mil." (Doc. 45-5 at 3).  However, the Medline contract had no minimum commitment and only covered a three-month span.  (Doc. 39-3 at 14).  CFS makes no effort to show that it was unreasonable for Synergy to forecast the Medline contract as producing $24,000 in annual revenue, as opposed to the $500,000 that it could possibly generate over some unspecified time frame.  As for Arthrex, the Revenue Bonus was only payable if forecasted annual revenues from "service contracts executed by customers for sterilization services to be performed at the Property" exceeded $1,850,000.  (Doc. 39-1 at 7).  Synergy points out (and CFS does not dispute) that the "Processing Letter of Intent and Supplier Agreement" between Synergy and Arthrex was not a binding agreement.  Accordingly, no service contract was executed by Arthrex during the relevant period, and the revenue that Synergy hoped to generate at some point from doing business with Arthrex was not relevant to determining whether the Revenue Bonus was due to be paid.

CFS next points to another report prepared by Thibault, this one in February 2012, titled "Americas Budget Review and Strategy Update".  (Doc. 45-6).  On page 7 of that report, CFS asserts, "Thibault indicates the Oldsmar Facility revenues to be near a $2 [million] figure; and on page 14 of the same report forecasts the Oldsmar Facility's revenues at more than $1.6 [million]." (Doc. 45 at 6).  Again, what CFS is citing to appears to be a printout of a slide presentation.  The slide presented at page 7 consists solely of a mostly illegible bar chart titled "Revenue by Facility," with one bar labelled "Oldsmar."  The amount of revenue indicated by the "Oldsmar" bar is approximately $1.6 million (rather than the "near $2 [million] figure]" suggested by CFS). In other words, this slide shows the Oldsmar Facility falling short of the $1.85 million threshold for payment of the Revenue Bonus.  In addition, there is no indication as to the time period in which Thibault expected to earn this $1.6 million and, most importantly, no indication that this $1.6 million figure was a forecast of revenue to be earned from contracts that had already been signed, as required to trigger payment of the Revenue Bonus.  This slide does nothing to help CFS's case.  This is also true of the slide set forth on page 14 of Thibault's report, which predicts revenue from the Oldsmar Facility of $1.64 million (again short of the $1.85 million threshold) for 2013 and, again, does not appear to be based on contracts that had already been signed.

Finally, CFS argues that forecasted revenue from letters of intent – such as the one signed by Arthrex in late 2011 – could be used to satisfy the $1.85 million threshold, even though the language of Section 2(c)(iii)(A) of the APA is limited to forecasted revenue from service contracts executed by customers.  (Doc. 45 at 7).  However, this argument is based on communications from Synergy, received after the signing of the APA, indicating that Synergy would be using LOIs for internal purposes.  CFS does not point to anything in those communications suggesting that

Synergy intended to vary the terms of the APA, which clearly specified that the only revenue forecasts that were relevant to the Revenue Bonus payout were those for signed contracts.

    B.     Earnout Bonus

CFS's arguments in regard to the Earnout Bonus are similarly unavailing. The formula for calculation of that bonus was set out in Section 2(c)(iii)(B) of the APA:

> Buyer shall calculate and determine (i) the total amount of capital expenditures paid or incurred by Buyer in connection with the acquisition and start-up of the Business at the Property, which expenditures shall include, but not be limited to, the amount of the Purchase Price, any amount paid to Seller in accordance with Section 2(c)(iii)(A) above, any additional equipment, parts and/or inventory acquired for the Business at the Property after the Closing Date, installation and engineering expenses, and the amount of any working capital required as a result of negative cash flow from the Business during the 15 month period commencing on the Closing Date and ending on the date of the 15 month anniversary of the Closing Date (collectively the "Capital Expenditures"); and (ii) the Earnout EBITDA. No later than sixty (60) days after the end of the Earnout Period,[1] Buyer shall pay to Seller an amount equal to:
>
> [A ÷ B] x 100 x $32,500
>
> Where A = the Earnout EBITDA; and B = the Capital Expenditures
>
> *Provided, however,* that the maximum amount payable by Buyer to Seller pursuant to Section 2(c)(iii)(B) shall not exceed $650,000.

(Doc. 39-1 at 7) (emphasis in original).

CFS concedes that the Earnout Bonus was only due to be paid if the Oldsmar Facility had a positive net income at the conclusion of the Earnout Period. (Doc. 45 at 17). And CFS has presented no evidence that the Oldsmar Facility turned a profit as of September 15, 2012.[2] CFS

---

[1] The "Earnout Period" was defined in the APA as "the 12-month period commencing on the date of the three (3) month anniversary of the Closing Date and ending on the date of the 15-month anniversary of the Closing Date." (Doc.39-1 at 4). Thus, the Earnout Period ran from September 15, 2011 to September 15, 2012.

[2] CFS does take issue with some of the expenses incurred by the Oldsmar Facility prior to

tries to argue that Synergy kept two sets of books, one of which showed the Oldsmar Facility turning a profit during the relevant time frame.  (Doc. 45 at 17).  However, the only evidence CFS can point to is a December 20, 2012 email sent to Thibault by Kelly San George.[3]  (Doc. 45-15 at 2).  In the email, San George discusses revisions that had been made to budget summaries, that were being prepared for higher-ups at Synergy, and states "In order to show Oldsmar at a profit, I brought the revenue up by $150K to $2,250K (the 6 runs of Stryker per week for 50 weeks at $3,725/run)."  (Doc. 45-15 at 2).  CFS characterizes this as San George having "used the real data from Stryker's processing to share with her superiors instead of the contract minimums for Stryker" that had been relied on in denying payment of the Earnout Bonus to CFS.  (Doc. 45 at 17).  This is not a reasonable interpretation of this email.  According to the subject line of the email, the budget being discussed in the December 20, 2012 email was for fiscal year 2014.  (Doc. 45-15 at 2).  Nothing in San George's alteration of projected revenues while creating a budget for a coming fiscal year suggests that Synergy was keeping more than one set of books.  Moreover, the fact that San George had to increase the projected revenue from the Stryker contract to show Oldsmar operating at a profit in 2014 reinforces the conclusion that it was not operating at a profit as of September 15, 2012, the last day of the Earnout Period.

      Thus, CFS has not presented any evidence from which a reasonable factfinder could conclude that Synergy (a) had signed contracts during the first year after the Closing Date with

---

the conclusion of the Earnout Period, such as the amounts paid to install some equipment there and the choice to include the salary for Synergy Health America's CFO as an expense on the Oldsmar Facility's books.  However, even assuming *arguendo* that those expenses were overstated, CFS has made no effort to show that, without them, the Oldsmar Facility would have earned a net profit during the Earnout Period.

    [3] In the signature block of her email, San George is identified as "Director, Finance" for Synergy.

forecasted annual revenues in excess of $1.85 million or (b) had a positive net income as of September 15, 2012.   Synergy is therefore entitled to summary judgment on the merits as to both bonuses on the breach of contract claim.[4]

### IV.   Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 39) filed by the Defendant, Synergy Health AST, LLC, is **GRANTED** as set forth above.   The Clerk is directed to enter judgment in favor of the Defendant and close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 20, 2017.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[4] Synergy had also argued that it was entitled to summary judgment as to the Revenue Bonus because the 3-year Delaware statute of limitations must have run before this suit was filed. (Doc. 39 at 13-19).   Synergy's position appears to be meritorious.   However, having concluded that Synergy prevails on the merits as to both bonuses, the Court will not address this affirmative defense, which would only apply to one of the bonuses.